1997 ME 171

**Mary E. LONG**

v.

**Richard J. LONG.**

Supreme Judicial Court of Maine.

Submitted on Briefs April 25, 1997.
Argued June 16, 1997.
Decided July 24, 1997.

Susan R. Kominsky (orally), Marvin H. Glazier, James C. Munch, III, Vafiades, Brountas & Kominsky, Bangor, for plaintiff.

Martha J. Harris (orally), Paine, Lynch & Harris, Bangor, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

WATHEN, Chief Justice.

[¶ 1] Defendant Richard J. Long appeals from the judgment entered in the Superior Court (Piscataquis County, *Kravchuk, J.*) affirming a divorce judgment entered in the District Court (Dover–Foxcroft, *Gunther, J.*) on a complaint brought by plaintiff Mary E. Long. Defendant contends that the District Court ignored precedent in ruling that real estate held in joint tenancy was marital property even though it was acquired in exchange for property he acquired before the marriage. He also contends that the court erred in dividing the property by failing to give due consideration to his contribution of nonmarital funds and to the economic circumstances of the parties. Finally, he contends that the court abused its discretion by conditioning its award of the residence to him on an unreasonable timetable for purchasing Mary's equity. For the reasons stated below, we overrule *Young v. Young*, 329 A.2d 386 (Me.1974), and *Tibbetts v. Tibbetts*, 406 A.2d 70 (Me.1979), and their progeny. We now hold that jointly owned real property is subject to division as marital property pursuant to 19 M.R.S.A. § 722–A (1981), even though parts of it were acquired with nonmarital funds. Finding no abuse of discretion in the court's division of the property, we affirm the judgment.

[¶ 2] At the time of the marriage,[1] Richard owned, subject to a mortgage, a residence in Pennsylvania. The parties lived in this home and made mortgage payments until Richard sold the property in 1977. After satisfying the debt secured by the mortgage, Richard received $38,234.38 from the sale of the Pennsylvania property. He placed $35,000 of those proceeds in a savings account made payable to him or Mary. After the sale, they lived in rented apartments in Pennsylvania until they moved to Maine in 1980. The parties purchased a home in Blanchard, Maine in December 1979 for $38,000. They applied the $35,000 account balance to the purchase of that home and took title as joint tenants. The record does not establish the source of the additional $3,000 applied to the purchase.[2] Thereafter, a $10,000 revolving home equity loan was taken out on the property. The loan proceeds were drawn on at unspecified times and were used to renovate and improve the property and to purchase a bulldozer for plowing the driveway. Loan repayments were made with marital funds on a monthly basis for an unspecified number of years.

[¶ 3] The parties separated and Mary filed a complaint for a divorce in June of 1993. Although the proceedings required a determination of the custody and support of two minor children, the distribution of the residence proved to be the primary source of contention between the parties. They agreed that the value of the house and land was $47,500. At the time of the hearing, the outstanding balance on the home equity loan was $3,700, resulting in a $43,800 equity in the property. Defendant has paid the mortgage, taxes, and insurance on the property since the separation. The court ruled that the real estate was marital property in its entirety, notwithstanding the source of funds. The court reasoned that Richard's transfer of funds to the joint savings account "evidences a gift to the marital estate, later reflected in joint title to the real estate." In dividing the marital property, the court ruled that the real estate should be shared equally. The court, however, awarded title to the real estate to defendant provided that he pay plaintiff one-half of the equity, $21,900, on or

---

1. The actual date of the marriage is in dispute. Some evidence suggests that the parties married in 1972, while other evidence suggests a 1976 date. This dispute is of no determinative significance to the issues raised on appeal.

2. Mary testified that this money came from $7,000 that Richard borrowed from her father. Richard testified, however, that he didn't borrow the $7,000 until after they moved to Maine. He borrowed this money because "I didn't have any money to live on and had no job, so I borrowed from her father." The loan was subsequently paid back.

before April 1, 1996. Defendant appealed to the Superior Court which affirmed the judgment.

## I. Marital Property

[¶ 4] Pursuant to our existing case law, the real property in question is a mixture of marital and nonmarital components that fits awkwardly into the legal framework for the disposition of property involved in a divorce. Mary acknowledges that most of the proceeds of the sale of the Pennsylvania property were nonmarital, at least until they were deposited in the joint savings account. Richard acknowledges that a small part of the $35,000 was marital to the extent that marital funds were used to pay the debt secured by the mortgage on his first house, thereby contributing to the equity. Neither party has established the character of the additional $3,000 that went into the purchase of the residence in Blanchard, nor do they address the impact of the home equity loan.

[¶ 5] If the entire purchase price had been provided from defendant's separate funds, our precedents require that it remain nonmarital property unless "transmuted" into marital property by an interspousal transfer in joint tenancy. *See Carter v. Carter*, 419 A.2d 1018 (Me.1980); *but see McCracken v. McCracken*, 617 A.2d 1034, 1035 (Me.1992) (third-party joint tenancy purchase using wife's nonmarital funds was an interspousal transfer in joint tenancy). If defendant provided something less than the entire purchase price, our precedents require that a corresponding portion of the jointly owned property be set apart in accordance with the "source of funds" rule. *See Tibbetts v. Tibbetts*, 406 A.2d at 76, and *Dubord v. Dubord*, 579 A.2d 257 (Me.1990).

[¶ 6] Because we have been inconsistent in recognizing the legal significance of joint ownership, the rules developed in our case law have produced conflicting and inequitable results. Even though a degree of reliance may have developed with regard to precedent, the facts of the present case compel the adoption of a rule that provides greater certainty and clearer guidance to litigants, family law practitioners, and trial courts. The rule we now adopt is consistent with the form of ownership, the statutory scheme, and the partnership theory of marriage that effectuates the reasonable expectations of wives and husbands acquiring jointly owned property.

[¶ 7] Maine's statutory scheme for the disposition of property in a divorce proceeding, 19 M.R.S.A. § 722-A (1981) (effective January 1, 1972), is modeled on the 1970 Uniform Marriage and Divorce Act. *Zillert v. Zillert*, 395 A.2d 1152, 1154-55 (Me.1978). In modernizing the law of divorce, the Legislature sought to remedy the inequities produced by the past practice of relying on the form of title and fault as the exclusive basis for dividing real property. At common law, marriage did not create rights to property held during the marriage, and a spouse could acquire an interest in the property of the other only by dower or curtesy rights on the death of the other. Under the prior law when a divorce was based on the fault of one spouse, the other spouse was entitled to the same one-third individual interest as though the spouse had died. Any interest that the spouse at fault held in the other spouse's property was dissolved by the divorce judgment. 19 M.R.S.A. §§ 721, 723 (1961). Thus, when one spouse held legal title to property, courts were required to set it aside to that spouse with an allowance only for fault. When property was held jointly, courts were required to set apart each spouse's one-half interest, subject to a similar allowance. Inequities resulted from the failure to recognize spousal contributions to the property during the marriage. *See Comment, The Maine Marital Property Act: The Duties of Divorce Courts and the Right to an Equitable Share of Marital Assets*, 31 Me.L.Rev. 333, 337-38 (1980). To overcome these inequities, the Legislature followed the lead of the uniform act and adopted the "shared enterprise or partnership theory" of marriage recognized in community property states. *Tibbetts v. Tibbetts*, 406 A.2d at 76.

[¶ 8] Section 722-A provides for the equitable or "just" division of shared or

partnership property, designated by the statute as "marital property." The statute provides a mechanism for identifying marital property, creates for spouses a right to an equitable share of marital property, and empowers the court to equitably divide the property. Subsection 3 of the statute provides that all property acquired by either spouse during the marriage is presumed to be "marital property," regardless of the form of ownership. 19 M.R.S.A. § 722–A(3). Thus, property held in the name of one spouse may still be treated as "marital property." The "marital property" designation grants no present rights in the property during the marriage but, on divorce, the court must divide all marital property "as the court deems just" granting an equitable share to each spouse. The court must consider all relevant factors, including the contributions of each spouse to the property, the value of property set apart to each spouse, the economic circumstances of each spouse, and other relevant factors. 19 M.R.S.A. § 722–A(1). The marital presumption gives effect to the shared enterprise theory of marriage. The power to divide the property, after considering all relevant factors, provides the divorce court with the flexibility needed to ensure that spouses receive their equitable shares.

[¶ 9] Section 722–A also recognizes that some property should be treated as separate in recognition of the principle that each spouse should be able to maintain a separate estate. *Grant v. Grant*, 424 A.2d 139 (Me.1981). Subsection 2 identifies property that is part of a spouse's "separate estate." *Property acquired prior to the marriage is separate.* Property acquired during the marriage can be treated as part of a spouse's separate estate only by rebutting the subsection 3 presumption that it is marital. This can be done by establishing that the property is:

A. Property acquired by gift, bequest, devise or descent;

B. Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise or descent;

C. Property acquired by a spouse after a decree of legal separation;

D. Property excluded by valid agreement of the parties; and

E. The increase in value of property acquired prior to the marriage.

19 M.R.S.A. § 722–A(2) (1981). Subsection 2 identifies property that falls outside of the partnership of the marriage. Once characterized as nonmarital, the court is required to set it apart to the owner. 19 M.R.S.A. § 722–A(1); *West v. West*, 550 A.2d 1132, 1133 (Me.1988). The other spouse has no right to an equitable share of the marriage partner's "separate property" and that property is not subject to the court's equitable powers of distribution. Although subsection 2 serves an important purpose in permitting spouses to maintain separate estates, it is an exception to the statute's primary and remedial purpose of providing an equitable and just division of assets acquired in the shared enterprise of marriage.

[¶ 10] The interplay between subsections 2 and 3 has proven most problematic when, as in the present case, real estate owned in joint tenancy can be traced, in whole or in part, to nonmarital sources. We first considered the treatment of "separate property" invested in jointly owned real estate in *Young v. Young*, 329 A.2d 386. In that case, in May 1971, a husband and wife acquired real estate in joint tenancy with funds each had acquired before the marriage—$11,765 from the husband and $500 from the wife. The trial court treated the property as marital. We determined that although the property was presumptively marital because it was acquired during the marriage, the presumption was overcome by evidence that a portion of the property was "acquired in exchange for property" acquired prior to the marriage. By failing to attach any legal significance to the form of ownership and focusing solely on the exception for maintaining a separate estate, we withheld the remedial power of equitable division.

[¶ 11] The testimony of the spouses in *Young* illustrates that they understood the significance of joint ownership.

> Defendant [husband] balked at accepting this [joint tenancy] deed, and the closing was adjourned to allow the Youngs opportunity for further consideration of the problem. In the subsequent discussions between plaintiff and defendant, defendant took the position that "whatever he had bought he had always bought by himself", and plaintiff's [wife's] view was that "in a ... marriage, ... it should be together, ... we ... should be as one"; and she further emphasized to defendant: "I would rather have it that way or I would rather stay in the home at Broadway." Ultimately, defendant agreed to accept the "joint-tenancy" deed, and the closing was completed.

*Young*, 329 A.2d at 387. The wife in *Young* urged us to adopt the "transmutation" doctrine from community property jurisdictions, whereby either spouse can "transmute" separate property into marital property by "an exercise of actual intention objectively manifested." *Id.* at 389. We declined to apply the doctrine in *Young* on technical grounds— the parties could not have intended to create marital property because it was acquired before the marital property statute went into effect.

[¶ 12] In a similar case, *Tibbetts v. Tibbetts*, 406 A.2d 70, the wife contributed $5,000 from assets she acquired before the marriage to the purchase price of the real estate acquired in joint tenancy during the marriage. The trial court declined to characterize the property as marital or nonmarital and let the form of ownership control the disposition of the property. The wife appealed, arguing that the court failed to fulfill its statutory duty to "set apart" her separate interest in the property. We reaffirmed the principle announced in *Young* that "to the extent the real estate had been acquired in exchange for property of either spouse acquired prior to marriage the presumption in 19 M.R.S.A. § 722–A(3) is overcome and the property cannot be marital." *Tibbetts*, 406 A.2d at 75.

We then adopted the "source of funds rule" and the "dynamic acquisition rule" as tools for tracing the marital and nonmarital components of property.

> [T]he source of funds rule grants to each estate, marital and nonmarital, a *pro tanto* interest in the ratio that the payments on the purchase price made with community funds bears to the payments made with separate funds.... We conclude that in fairness to both spouses "acquisition" must not arbitrarily and finally be fixed on the date that a legal obligation to purchase is created.... Rather, "acquisition" should be recognized as the on-going process of making payment for acquired property. Characterization of the property acquired will then depend on the source of each contribution as payments are made.

*Id.* at 76–77.

[¶ 13] One year later, we confronted more directly the "problem of dealing with joint tenancy property within the marital property context" in *Carter v. Carter*, 419 A.2d 1018, 1021 (Me.1980). We then determined that the transmutation doctrine considered in *Young* would apply when one spouse transfers property to both spouses jointly during the marriage. The husband in *Carter* acquired real estate prior to the marriage. During the marriage he conveyed the property to himself and his wife as joint tenants. Referring to joint tenancy property under the old common law regime, we stated:

> That some couples chose to put property in joint tenancy even though one spouse had paid all of the purchase price from separate funds represented a recognition of the partnership nature of marriage by those couples before the law itself adopted that theory.

*Id.* at 1022. We gave effect to this "recognition of the partnership" that we failed to acknowledge in *Young*, and noted that by doing so

> we avoid the illogical and inequitable results, as well as the complications, application of the "tracing" doctrine would pro-

duce in situations like that in the case at bar where the court would be required to ignore the couple's recognition of their partnership ... Furthermore, this treatment is also more equitable than leaving divorced parties with a joint tenancy.

As a result, the property in *Carter* was characterized as marital property,and the husband was prevented from including it in his separate estate merely by showing that the property was "acquired in exchange for property acquired prior to the marriage." In this context, we attached legal significance to the form of ownership in recognizing that by his deed, the husband created marital property.

[¶ 14] In *Dubord v. Dubord,* 579 A.2d 257 (Me.1990), we expressly limited the "transmutation" doctrine to interspousal transfers of real estate in joint tenancy, leaving the *Young* and *Tibbetts* rules to control joint tenancy acquisitions from third parties. The wife in *Dubord* contributed $10,000 acquired before the marriage to real estate acquired in joint tenancy from a third party during the marriage. The trial court applied *Carter* and found that the $10,000 was a contribution to the marital estate and declined to set it apart to the wife. We distinguished *Carter* and held that the $10,000 must be set apart. We noted that:

> The joint deed to the property acquired by the parties in the present case is consistent with the fact that the purchase price was derived from two separate sources. Indeed, joint ownership of property thus acquired is the only way to represent the fact that the purchase price came from both spouses. In contrast, in the *Carter* situation, the joint deed could serve no purpose other than to record a gift.

*Id.* at 260. Thus, we retreated from the notion that the choice of joint ownership creates marital property. Finally, in *McCracken v. McCracken,* 617 A.2d 1034 (Me.1992), we expanded the definition of an interspousal transfer to include a joint tenancy purchase from a third party using one spouse's nonmarital funds.

[¶ 15] Our inconsistent treatment of jointly-owned property has resulted from focusing on the presumed intent of the parties rather than the objective facts of joint ownership. The text of section 722–A sheds no light on this problem. In *Grant,* Justice H. Glassman, in his concurring opinion, accurately stated that "it is fruitless to endeavor to determine the meaning of subsections 2 and 3 as well as their interrelationship by a mere textual analysis." He rejected the textual analysis of his colleagues and formulated a rule based on the intention and purpose of the statute. He concluded that

> the partnership concept of marriage is enhanced by a recognition that property acquired *jointly* by the spouses during marriage by gift, bequest, devise or descent is a part of the marital estate.

*Grant,* 424 A.2d at 144 (emphasis added). We adopt his reasoning and extend his conclusion. The purpose of the statute is enhanced by recognizing that real property acquired jointly during marriage, whether transferred from a spouse or a third party, becomes a part of the marital estate. As we have held with respect to interspousal transfers, the motivation for the transfer is irrelevant. *Carter,* 419 A.2d at 1021 n. 3; *Lalime v. Lalime,* 629 A.2d 59, 61 (Me.1993); *Weeks v. Weeks,* 650 A.2d 945, 947 (Me.1994).[3]

[¶ 16] A deed in joint tenancy creates present ownership rights that are capable of immediate transfer. It is incongruous to conclude that such an outright transfer of ownership to a spouse fails to create divisible marital property in the event of divorce. In the context of a partition action between unmarried joint tenants, we have stated: "To allow the consideration of contributions preceding a joint tenancy would defeat joint ownership." *Boulette v. Boulette,* 627 A.2d

---

3. As we stated in *Lalime,* the presumption that jointly owned property is marital can be overcome "by clear and convincing evidence 'that the transferring spouse did not intend to transfer the property to joint ownership or was induced to do so by fraud, coercion, duress, or deception.'" *Lalime,* 629 A.2d 59, 61 n. 1 (citation omitted).

1017, 1018 (Me.1993). Ironically, pursuant to the *Tibbetts* rule, a married person not only escapes equitable division but gains an ability to recapture a separate estate that is denied any other joint tenant. Any unfairness pursuant to the new rule is addressed by the court's consideration of all relevant factors, in dividing marital property, including the length of the marriage and the relative contribution of the spouses. Section 722–A relies on an equitable division rather than an inflexible system of classification to achieve justice in complex circumstances. We overrule the *Young* and *Tibbetts* line of cases to the extent that they treat jointly owned real property as separate property.

[¶ 17] By recognizing the legal significance of joint ownership, we do not resurrect the inflexibility and inequities of the prior law, nor do we deviate from the text of the statute. By holding that joint ownership results in marital property, we correct the interplay between subsections 2 and 3 and advance the statutory purpose of subjecting shared assets to the court's equitable powers of division.

[¶ 18] In the instant case, the parties agree that the fair market value of the residence is $47,500, that it was purchased for $38,500, and that the major source of the initial purchase price, $35,000, can be traced to property acquired by defendant before the marriage. After a lengthy marriage, and fourteen years of joint ownership and commingling, Richard seeks to apply the source of funds rule to set apart the $35,000 as his separate nonmarital property. The court applied the transmutation doctrine and ruled that Richard's transfer of funds to the joint savings account "evidences a gift to the marital estate, later reflected in joint title to the real estate." We uphold that result on the basis of the form of ownership chosen by the parties with respect to the real estate.

## II. Division of Property

[¶ 19] We review the division of marital property for an abuse of discretion.

*Arey v. Arey*, 651 A.2d 351, 353 (Me.1994). The court's division will be overturned only if it results in plain and unmistakable injustice, so apparent that it is instantly visible without argument. *Foley v. Foley*, 642 A.2d 1346, 1347 (Me.1994). The statute provides that:

[T]he court shall divide the marital property in such proportion as the court deems just after considering all relevant factors, including:

A. The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse homemaker;

B. The value of the property set apart to each spouse; and

C. The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children.

19 M.R.S.A. § 722–A(1) (1981).

[¶ 20] Richard argues that the court abused its discretion and made an unfair division of marital property. The court ruled that the value of the real estate should be shared equally and awarded the real estate to defendant provided that he pay plaintiff one-half the equity, $21,900, on or before April 1, 1996.[4] Richard contends that the court failed to give adequate weight to his contribution to the purchase price of the residence and to the economic circumstances of the parties. He asserts that he contributed over 95% of the initial purchase price and that at age 62 he is at retirement age, whereas plaintiff at age 47 has many years of work left. He also argues that the court abused its discretion by setting an unreasonable timetable for his purchase of plaintiff's one-half interest in the residence. He asserts that he is unable to obtain a bank loan within such a short time.

4. The court's order further provides that:
   If payment is not made, the house is to be sold and the proceeds divided equally after payment of the home equity loan, expenses of sale, and reimbursement of Mr. Long for one-half of any taxes paid or payments made on the home equity loan from this date.

[¶ 21] The record reflects that Richard has worked full-time as a dispatcher for the local sheriff's office for thirteen years and also works part-time as a bank security guard. His annual income at the time of the divorce was approximately $25,000. He has no pension rights with the sheriff's office, but he testified that he expects to collect a pension from his sixteen years of employment in Pennsylvania. At the time of the hearing, he did not know the value of the pension but thought he might be eligible to collect $100 a month when he is age 65. He pays $32 per week for child support, and he owes $4,000 on a personal loan that he used to pay child support arrearages. Mary worked part-time during the marriage and took care of the children at home. She has worked for the local school department for seven years, and her annual income before the divorce ranged from $9,000 to $12,500. She has no pension rights. She saved $1,350 since the separation in 1993.

[¶ 22] The court granted shared parental rights and responsibilities and designated the primary residence of the seventeen-year-old daughter with Mary and of the twelve-year-old son with Richard. When the daughter reaches majority, the judgment provides that Mary will be obligated to pay child support to Richard for the benefit of the son.

In reaching its decision the court stated:

Given the number of years the parties have shared the house, the Court does not find it equitable to premise division on the basis of traceable contributions. The property should be shared equally.

With respect to personal property the court stated:

While values were not given, it appears that Mr. Long has retained the plurality of the personalty. In addition to tangible personal property, he is awarded the marital pension rights. Mrs. Long is to retain her savings account.

No alimony or attorney fees were awarded.

[¶ 23] Although Richard is closer to retirement age than Mary, he has a greater present earning capacity and will collect a small pension. Mary has no pension rights. Richard was also granted the "plurality of the personalty." The court properly weighed the contributions of each spouse to the residence—defendant's "traceable contribution" to the purchase price and plaintiff's contributions over the length of the marriage—and it considered the economic circumstances of each spouse, as well as the value of other property set apart to each spouse. Richard has failed to demonstrate that the division resulted in a plain and unmistakable injustice, so apparent that it is instantly visible without argument. He has also failed to demonstrate any unfairness or abuse of discretion reflected in the conditions established by the court for purchasing plaintiff's share of the equity in the residence.

The entry is:

Judgment affirmed.

