2002 ME 92

**Terry L. HOAG f/k/a Terry L. Dick**

v.

**Richard DICK**

Supreme Judicial Court of Maine.

Argued: March 7, 2002.
Decided: June 7, 2002.

David M. Lipman, (orally), Karen E. Boston, Lipman & Katz, P.A., Augusta, for plaintiff.

Sean M. Farris, (orally), Farris, Heselton, Ladd & Bobrowiecki, P.A., Gardiner, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, and CALKINS, JJ.

DANA, J.

[¶ 1] Richard Dick appeals from a judgment of the District Court (Augusta, *Perry, J.*) holding that Dick's premarital agreement with Terry L. Hoag (formerly Terry L. Dick) was invalid and unenforceable. Dick contends that the court erred in failing to apply the Uniform Premarital Agreement Act (UPAA), 19-A M.R.S.A. §§ 601–611 (1998), and that, in the alternative, the court erred in its interpretation and application of Maine common law regarding premarital agreements. Hoag contends that the UPAA does not apply, that the court did not commit clear error in finding the agreement unenforceable, and that the court's analysis was consistent with the applicable common law. We affirm the judgment.

## I. BACKGROUND

[¶ 2] The court found the following undisputed facts. Dick and Hoag were married in 1982, and were divorced in 1986. They continued to live together after the divorce. Because Hoag's church threatened to excommunicate her unless she ceased cohabiting with Dick or married him, Hoag and Dick discussed getting remarried. They informally discussed the nature of premarital agreements in the company of Dick's son, an attorney, in the late winter of 1987. When the discussion turned more specifically to drafting a premarital agreement for Dick and Hoag, Dick's son suggested that each be represented by a separate attorney. Hoag said she did not need separate counsel because she did not want anything. Dick insisted that he would remarry Hoag only if they executed a premarital agreement. In April of 1987, Dick and Hoag agreed to remarry.

[¶ 3] Ultimately, Dick's son drafted a premarital agreement, which was delivered to the parties on May 23, 1987, the date of the wedding. Dick made one modification at that time and Hoag gave the agreement a cursory reading. There were no further discussions about Hoag obtaining the advice of independent counsel. The parties executed the document in the church parking lot immediately before the wedding ceremony.

[¶ 4] The agreement provides that the estate of each party "shall remain and be his [or her] separate property subject entirely to his [or her] individual control and use the same as if he [or she] were unmarried"; that each party relinquishes all rights to "any property that [the other] may hereafter acquire or become entitled to"; that the party bringing an action for divorce "agrees to pay all expenses incurred in such action, and agrees that the other party shall never be called upon to pay alimony, separate maintenance, cost of suit or any other expense incurred by the party bringing the action except as otherwise provided herein"; and that, regardless of who commences the suit, Hoag "shall accept [$6,000] in full satisfaction of all of her claims" and Dick "shall make no claim to the separate estate of [Hoag]." An attachment disclosed some, but not all, of Dick's property. At the time they executed the agreement, Hoag was, nonetheless, aware of all of Dick's property and that it was valued at approximately one million dollars. Hoag owned some personal property of negligible value, but no real property.

[¶ 5] Hoag filed a complaint for divorce in 1997. Dick moved for a summary judgment on the validity of the premarital agreement. After a hearing, the court entered an order pending divorce concluding that the premarital agreement was invalid and unenforceable. Dick appealed to the Superior Court (Kennebec County, *Studstrup, J.*), which dismissed his appeal

as interlocutory. He appealed to us, but we also dismissed.

[¶ 6] The District Court (Augusta, *French, J.*) entered a divorce judgment that awarded to Hoag, inter alia, $150,600 representing her share of the marital property; general spousal support of $600 per month until October 31, 2006, with nominal support thereafter; and attorney fees of approximately $17,500. The court awarded to Dick, inter alia, all the real property and most of the personal property, including a sail boat and home furnishings.

## II. DISCUSSION

[¶ 7] Because Dick does not contest the court's factual findings, we review the legal determination of the agreement's validity and enforceability de novo for errors of law based on the facts found by the court. *See Trask v. Devlin,* 2002 ME 10, ¶ 14, 788 A.2d 179, 182 (stating that cases involving mixed questions of law and fact are reviewed for errors of law if the parties do not dispute the factual findings).

### A. The Uniform Premarital Agreement Act

[¶ 8] Dick contends that the court erred in refusing to apply the enforcement provision of the UPAA, 19–A M.R.S.A. § 608,[1] because the statute simply codifies general and long settled contract law.

Dick further contends that the Legislature intentionally omitted the uniform act's provision that the act applies to any premarital agreement executed on or after the effective date. Hoag contends that the statute may only be applied prospectively to agreements executed after the UPAA's effective date.

[¶ 9] The UPAA became effective on September 29, 1987. P.L.1987, ch. 302. Although the uniform act that provided the basis for the Maine act included a provision that the act "applies to any premarital agreement executed on or after [the effective] date," UNIFORM PREMARITAL AGREEMENT ACT § 12, 9C U.L.A. 58 (2001), the Maine act does not contain that provision.

[¶ 10] The Maine Constitution provides that "[t]he Legislature shall pass no . . . law impairing the obligation of contracts," Me. Const. art. I, § 11, and we construe statutes to preserve their constitutionality, *Town of Baldwin v. Carter,* 2002 ME 52, ¶ 9, 794 A.2d 62, 66. Here, although Hoag filed for the divorce after the effective date of the statute, the execution of the agreement could not have been informed by an understanding of the now existing statute; we decline to apply the UPAA to this case because to do so would interfere with the contract and violate the Maine Constitution.

---

1. The UPAA provides a test to determine whether a premarital agreement is enforceable:

A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
A. That party did not execute the agreement voluntarily; or
B. The agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(1) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
(2) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
(3) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

19–A M.R.S.A. § 608(1).

### B. Maine's Common Law Regarding Premarital Agreements

[¶ 11] Dick contends that the court should have implied a new legal standard from the 1979 amendment to the Probate Code permitting a spouse, after fair disclosure, to waive by agreement rights of election and rights to certain allowances. 18-A M.R.S.A. § 2-204 (1998). Dick also contends that the court erroneously relied on outdated Maine common law that fails to reflect the status of women in modern society. According to Dick, the court erred in applying a rule requiring that a party enter into a contract intelligently and upon independent legal advice.

[¶ 12] The court relied in part on our holding in *Rolfe v. Rolfe*, 125 Me. 82, 130 A. 877 (1925), a case in which the marriage dissolved by the husband's death and the parties had executed a premarital agreement defining the rights of the surviving spouse. *See id.*, at 82–83, 130 A. at 877. We stated that it was the settled law in Maine

> that there shall be no fraud or imposition practiced; that full and complete disclosure shall be made, and that adequacy in provision for the spouse shall result; that gross disproportion of such adequacy may invalidate such agreement; that the natural confidence of the relations of the parties shall not be violated; that, where gross disproportion results, fraud will be presumed; and that the burden is upon him who sets up an antenuptial agreement to prove fairness, notice, understanding, and adequacy.

*Id.* at 83, 130 A. at 878.

[¶ 13] Since the *Rolfe* decision, we have stated that, although a defendant in an action to enforce such an agreement bears the burden of proving affirmative defenses of fraud, duress, or intimidation, a presumption of fraud arises when the evidence establishes that the agreement's provisions for the surviving spouse are "clearly disproportionate to the [deceased spouse's] wealth." *Wilson v. Wilson*, 157 Me. 119, 131, 170 A.2d 679, 686 (1961). To overcome the presumption, the representative of the deceased spouse must establish the surviving spouse's "full knowledge and understanding ... at the time of execution of all the facts materially affecting her interest, viz.: the extent of his wealth and her rights in his property as his survivor, and how modified by the proposed agreement ...." *Id.* at 131–32, 170 A.2d at 686 (internal quotation marks omitted).

[¶ 14] Nearly two decades after our decision in *Wilson*, the Legislature adopted the following provision of section 2-204 of the Probate Code:

> The right of election of a surviving spouse and the rights of the surviving spouse to homestead allowance, exempt property and family allowance, or any of them, may be waived, wholly or partially, before or after marriage, by a written contract, agreement or waiver signed by the party waiving after fair disclosure....

18-A M.R.S.A. § 2-204. After the enactment of this provision, we reviewed a case in which the husband died while the divorce action was pending, and his estate contended that the husband and wife's "Agreement Incident to Divorce," purporting to dispose of all the parties' marital and non-marital property, constituted a waiver of the wife's elective share in his estate. *Estate of Galluzzo*, 615 A.2d 236, 238 (Me.1992). We affirmed the Probate Court's finding that the contract was executory, and stated that the husband had not provided "fair disclosure" pursuant to section 2-204 because the wife executed the "Agreement" on the day she received service of the divorce complaint without the

advice of independent counsel. *Id.* at 238. Our interpretation of section 2–204 of the Probate Code therefore comports with our earlier cases holding that the circumstances of execution must be fair. *See, e.g., Rolfe,* 125 Me. at 83, 130 A. at 878 (requiring a showing of "fairness, notice, understanding, and adequacy" when the gross disproportion of an agreement triggers a presumption of fraud).

[¶ 15] We have acknowledged, by implication, that people may execute enforceable premarital agreements that apply in the event of a divorce. *See Foster v. Foster,* 609 A.2d 1171, 1172 (Me.1992) (agreement providing rights as widow is inapplicable in the event of a divorce); *Estate of Berzinis,* 505 A.2d 86 (Me.1986) (agreement defining parties' rights upon divorce inapplicable when wife was widowed); *Skelton v. Skelton,* 490 A.2d 1204, 1205–06 (Me.1985) (agreement waiving alimony and property claims in the event of divorce inapplicable to the parties' second divorce following remarriage).

[¶ 16] Here, the premarital agreement all but eliminates Hoag's rights to receive a share of the marital property and to recover any amount of spousal support. Pursuant to the agreement, she would only recover $6000 in settlement of all claims, and as the party bringing the action, she would be responsible for all litigation costs. The agreement was presented to Hoag on the day of her wedding, thus depriving her of any opportunity to obtain advice from independent legal counsel regarding the document's terms. *See Galluzzo,* 615 A.2d at 238 (recognizing a lack of independent counsel as a factor for determining whether the signor's spouse offered "fair disclo-

sure" pursuant to 18–A M.R.S.A. § 2–204); *see also In re Marriage of Norris,* 51 Or.App. 43, 624 P.2d 636, 638–40 (1981) (holding agreement unenforceable when the husband presented a premarital agreement during the trip to the wedding without the wife's opportunity to seek legal counsel and without informing her of his financial holdings); *Bauer v. Bauer,* 1 Or. App. 504, 464 P.2d 710, 711–12 (1970) (holding agreement unenforceable when the husband presented it the day the parties left to get married out of town, failed to disclose his assets, and failed to allow sufficient time for her to consult a lawyer independently). Without the advice of counsel or time for consideration of the document, she could not fully know and understand the rights she relinquished by signing the agreement. *See Friedlander v. Friedlander,* 80 Wash.2d 293, 494 P.2d 208, 214 (1972) (holding agreement unenforceable when wife lacked independent advice of counsel, did not freely and voluntarily sign the agreement with knowledge of the husband's property and worth, and was not fully aware of her rights).[2] The court's factual findings regarding the circumstances of execution support its conclusion that the premarital agreement is unenforceable.

The entry is:

Judgment affirmed.

---

2. Although Dick contends that the court erred in citing out-of-state cases, citation to analo-

gous cases as persuasive authority is appropriate.