2011 ME 114

**Karen A. LAQUALIA**

v.

**John A. LAQUALIA.**

Supreme Judicial Court of Maine.

Argued: Sept. 13, 2011.
Decided: Nov. 17, 2011.

N. Laurence Willey, Jr., Esq. (orally), Thomas M. Matzilevich, Esq., Willey Law Offices, Bangor, for appellant Karen A. Laqualia.

Dana E. Prescott, Esq., (orally), Prescott, Jamieson, Nelson & Murphy, LLC, Saco, for appellee John A. Laqualia.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

GORMAN, J.

[¶ 1] Karen A. Laqualia appeals from the District Court's (Bangor, *Dobson, J.*)[1] divorce judgment ending her marriage to John A. Laqualia. She challenges the trial court's failure to award her attorney fees and its valuation and distribution of certain marital and nonmarital assets. Karen also appeals from the District Court's (Bangor, *Jordan, J.*) refusal to consider her postjudgment motion to enforce the preliminary injunction entered pursuant to 19–A M.R.S. § 903(1)(B)(3) (2010) when she filed this action for divorce. Karen has consoli-

dated her appeals before us. We affirm most of the divorce judgment but remand for a single issue concerning the distribution of the marital estate, and affirm the trial court's action with respect to the postjudgment motion.

## I. BACKGROUND

[¶ 2] On August 16, 1994, Karen and John entered into a premarital agreement, and, eleven days later, they married. At the time of their marriage, Karen had amassed a sizeable estate worth more than $2,000,000 that included a house in Bangor, and a camp in Trenton, as well as paintings, jewelry, and investment accounts. Karen acquired these assets, and continued to receive ongoing payments during the marriage, as a result of a consulting arrangement that she entered into prior to the marriage, but which was subsequently amended through a settlement agreement reached after she and John married.

[¶ 3] John's premarital estate was valued at $20,000. During the marriage, with some assistance from Karen, he developed a computer software business known as PeakKnowledge. Karen and John used the income from PeakKnowledge, the payments Karen received from her consulting arrangement, and her assets, to live lavishly, travel, and acquire substantial real and personal property.

[¶ 4] In 2007, Karen initiated this divorce, citing irreconcilable differences. After nearly three years of highly contentious litigation, the parties presented more than eighteen hours of testimony and admitted boxes of exhibits to the court (*Dobson, J.*) during a three-day trial in May 2010. Because Karen and John have no children from the marriage, the only issues

1. Karen originally filed this action in the District Court sitting in Ellsworth, but it was subsequently transferred to Bangor.

to be decided by the court involved property. That property included (1) three pieces of real property: a condominium in Bangor, a residence in Florida, and the camp in Trenton; (2) retirement and investment accounts; (3) valuable personal property; and (4) PeakKnowledge. The parties' premarital agreement affected the division and distribution of this property. John challenged the application of the premarital agreement, but the court found it to be "fully enforceable and binding on the parties."

[¶ 5] At trial, Karen advanced myriad theories and claims purporting to support her demand that John be ordered to make significant payments to her. The trial court considered these claims and, in the findings of fact and conclusions of law it issued simultaneously with its judgment, found that, "[b]ecause of the manner of presentation of multiple and duplicative exhibits making exaggerated and unfounded claims interspersed with legitimate claims, it is impossible to ascertain with precision how much John might owe Karen." The trial court then held:

> John does not owe Karen anything other than those amounts which will be set off against the equitable distribution to John herein and representing (1) claimed Contempt damages in the approximate amount of $40,000 ... and (2) funds paid out of PeakKnowledge for the benefit of Carol Trevains in the amount of $50,000 and (3) Trenton rental income of $21,000 and [$34,297.71 to compensate Karen for two tax-related issues].

Based on these findings, and, after applying the parties' premarital agreement to the evidence presented to divide the real and personal property, the court ordered John to pay Karen $145,000. The court then ordered Karen to pay John $300,000 to achieve an "equitable distribution."

[¶ 6] On August 23, 2010, Karen filed a request for further findings of fact and conclusions of law. In addition to forty-one other requests, she asked the court to determine whether John had violated the preliminary injunction by discontinuing her health insurance. The trial court responded to Karen's requests to the extent appropriate and otherwise "decline[d] to respond to [Karen]'s request for further findings of fact and conclusions of law."

[¶ 7] In Karen's November 5, 2010, notice of appeal, she listed the trial court's decisions regarding health insurance in her statement of the issues. Then, on November 22 and 24, 2010, Karen moved the District Court and us[2] to enforce the preliminary injunction, claiming John removed her from his health insurance policy in violation of the injunction. On February 7, 2011, the trial court held it lacked jurisdiction to enforce the preliminary injunction during the pendency of Karen's appeal. Karen timely appealed from this judgment, and she consolidated her appeals before us.

## II. DISCUSSION

[¶ 8] Karen claims multifarious errors for our review. Her statement of issues spans five single-spaced pages. She listed the issues under ten headings, which are further described in a total of fifty-two subheadings. Nevertheless, Karen's claimed errors effectively coalesce into four issues.

[¶ 9] First, Karen contends the trial court erred in its valuation of certain assets and in its equitable distribution of the marital estate. Second, Karen asserts the trial court erred in distributing her nonmarital property to John to create an "equitable distribution." Third, Karen argues the trial court erred in holding it lacked jurisdiction to consider her motion to enforce the preliminary injunction after she

---

2. Karen subsequently withdrew her motion here.

filed her notice of appeal. Fourth, Karen claims the trial court erred in denying her request for attorney fees. We address each contention below.

## A. Valuation of Property

■ [¶ 10] Karen contends the trial court erred in its finding that the business, PeakKnowledge, is worth $51,000. "We review the court's factual findings, including determinations about an asset's value or its classification as marital or nonmarital property, for clear error." *Bond v. Bond*, 2011 ME 54, ¶ 10, 17 A.3d 1219 (citing *Wandishin v. Wandishin*, 2009 ME 73, ¶ 12, 976 A.2d 949). A trial court's factual finding is not clearly erroneous if there is any competent evidence in the record to support it. *Bond*, 2011 ME 54, ¶ 15, 17 A.3d 1219. Further, "[w]e review the court's distribution of the property for an abuse of discretion." *Id.* ¶ 10 (citing *Carter v. Carter*, 2006 ME 68, ¶ 14, 900 A.2d 200).

■ [¶ 11] The testimony of Karen's own expert, Dr. Robert Strong, supports the trial court's finding. Dr. Strong testified the "simple net asset value" of Peak-Knowledge was $51,644. Thus, the trial court did not clearly err in adopting that value.

■ [¶ 12] Additionally, Karen challenges the trial court's valuation of the Lotus vehicle, the ING account and N.Y. Life IRA, and the Trenton camp. With the exception of the Lotus vehicle, the trial court awarded all of these assets to Karen. Fluctuations in their value, then, are of minimal relevance. A divorce court's failure to consider the value of nonmarital property once the parties presented evidence on the subject would be an abuse of discretion. *See Kruy v. Kruy*, 2002 ME

14, ¶¶ 5–6, 789 A.2d 99. Where the parties fail to present evidence on the nonmarital property's value or, as here, where the trial court finds their evidence inconclusive and contradictory,[3] a party cannot bemoan the trial court's failure to adopt her view. *See id.* ¶ 6. In any case, the court's valuation of that property remains a question of fact, which we will not overturn so long as any competent evidence in the record supports the trial court's finding. *See Bond*, 2011 ME 54, ¶ 15, 17 A.3d 1219. The record supports the trial court findings as to value of the assets, including the Lotus, and as a result, we affirm.

## B. Distribution of Property

■ [¶ 13] We have long recognized a three-step process for distributing property in a divorce. *See Grishman v. Grishman*, 407 A.2d 9, 11 (Me.1979). The trial court must first distinguish marital from nonmarital property. *Id.* Then, the court must set apart nonmarital property. *Id.* Finally, the court must divide marital property "in such proportion as the court deems just." *Id.*

■■ [¶ 14] All property acquired by either or both spouses during marriage is presumed to be marital property. 19–A M.R.S. § 953(3). This presumption may be overcome by showing the property was acquired pursuant to one of five statutory exceptions. *See* 19–A M.R.S. § 953(2)(A)-(E). One of the exceptions is "[p]roperty excluded by valid agreement of the parties." 19–A M.R.S. § 953(2)(D). Although section 953 does not define "valid agreement," we hold that a "valid agreement" pursuant to section 953(2)(D) includes a premarital agreement that is enforceable pursuant to Maine's Uniform Premarital Agreement Act.[4] *See* 19–A M.R.S. §§ 601–611.

3. In a note to the trial court's chart of assets, it specifically addressed Karen's inconclusive evidence regarding the value of the ING account.

4. Maine law recognizes the validity of pre-

**[¶ 15]** When a valid premarital agreement excludes property from the marital estate, a divorce court lacks statutory authority to award this separate property to the other spouse because a divorce court "*shall* set apart to each spouse the spouse's property." *See* 19–A M.R.S. § 953(1) (emphasis added). "The trial court has no discretion in the allocation of the nonmarital property; it must be transferred to the spouse to whom it belongs. The equitable considerations applicable to the just division of marital property do not apply to the setting apart of nonmarital property."[5] Levy, *Maine Family Law*

§ 7.5.1 at 7–24 (6th ed.2009); *see Long v. Long*, 1997 ME 171, ¶ 9, 697 A.2d 1317 (holding "[t]he other spouse has no right to an equitable share of the marriage partner's 'separate property' and that property is not subject to the court's equitable powers of distribution").

**[¶ 16]** The trial court held the premarital agreement between John and Karen was valid and binding on the parties, and John does not challenge that ruling on appeal.[6] Pursuant to the premarital agreement, all property in Karen's name alone at the time of the divorce is her nonmarital separate property.[7] The

---

marital agreements. In 1987, Maine adopted the Uniform Premarital Agreement Act. P.L. 1987, ch. 302, codified at 19–A M.R.S. §§ 601–611. The Act permits parties to a contemplated marriage to agree as to the disposition of property in the event of marital dissolution. 19–A M.R.S. § 604(3). The Act also permits "modification or elimination of spousal support." *Id.* § 604(4).

5. We note a single case in which a divorce court awarded a spouse's nonmarital property to implement a spousal support obligation; if this reflects a true exception to the rule, this exception does not apply here because Karen and John's premarital agreement unequivocally bars awarding spousal support. *See Palacci v. Palacci*, 613 A.2d 951, 953, 955 (Me. 1992).

6. At oral argument, John suggested that the passage of time somehow undermined the enforceability of the premarital agreement. In his brief, however, John challenged only the trial court's application of the agreement, not its validity. To the extent he intended to advance this novel theory at oral argument, we decline to consider it. *See United States v. Pulido*, 566 F.3d 52, 60 n. 4 (1st Cir.2009) (noting that absent extraordinary circumstances, arguments raised for the first time at oral argument are waived).

7. The relevant sections of the premarital agreement state:
  5.1. Except as herein specifically provided to the contrary, the Parties adopt as their property regime that of separation of property. *They intend that their property*

*remain separate throughout their marriage. They further acknowledge that there are between them no rights or obligations respecting sharing of property, and each spouse renounces such rights and obligations now and for the future.* The Parties acknowledge the possibility that either or both of them may use the proceeds of their separate property to acquire, in whole or in part, property in joint or common ownership between them or otherwise identified as marital property. In that event, the Parties agree that each will have the right to trace the proceeds of his or her separate property so used, and that no presumption of gift to the marital estate or the other Party shall arise. Reference is specifically made to the Service Contract/Consulting Agreement dated August 30, 1991, by and between KAG Consulting, Inc. and CHE, Inc. which will remain the sole property of the Wife.
  5.2. The Parties agree that each of them will have separate incomes during the course of their marriage and that they may accumulate some portions of their earnings or profits in assets in their separate names, the character of which assets under Maine law would be marital property, but which by agreement of the Parties, shall be treated as the sole property of the Party in whose name the asset appears. *Upon separation or dissolution of the marriage, such asset or assets shall remain the property of the Spouse in whose name the asset appears and be treated as the non-marital property of that Spouse.* Appreciation in the value of such asset shall be treated in the same manner. (Emphasis added.)

court did award to Karen the property in her name, as required by the terms of the parties' premarital agreement. That property included the camp in Trenton, valued at over $680,000, investment accounts worth more than $1,300,000, and jewelry, art, and antiques worth $120,000. In keeping with the premarital agreement, the court also awarded John the property held solely in his name as his nonmarital property, which was much less valuable.

[¶ 17] As noted above, pursuant to the terms of the premarital agreement, only property not titled solely in either party's name can be considered part of the marital estate. The agreement states, "[Karen and John] may accumulate some portion of their earnings or profits in assets in their separate names [which] shall be treated as the sole property of the Party in whose name the asset appears."

[¶ 18] Karen and John's only marital property was PeakKnowledge, the house in Florida, the condominium in Bangor, and a Commonwealth account worth $13,000. Pursuant to the parties' agreement during this litigation, the court awarded Karen the house in Florida and the condominium in Bangor. The court awarded John PeakKnowledge and divided the Commonwealth account in half, awarding each party $6,500.

[¶ 19] After dividing the marital estate, the court then attempted to create "an equitable distribution that does justice between the parties," by ordering Karen to pay John $300,000. The court's order was in error, however, because the size of the marital estate did not support the award, and the court could not distribute Karen's nonmarital property to John. The court repeated this error in its findings of fact and conclusions of law when it held, "[e]quitable distribution in Maine permits the Court to do *equity* (even if that means a distribution from Karen's nonmarital assets) . . . ."

[¶ 20] The presumptively marital property awarded exclusively to Karen comprised the Bangor condominium, which was acquired and held by PeakKnowledge, and the house in Florida, which was held in both names. By the terms of the premarital agreement, it was each party's burden to "trace the proceeds of his or her separate property" if he or she wished to overcome the presumption that property acquired after marriage and not held solely in either name was marital. Although Karen has asserted that both items are either entirely or primarily her nonmarital property, in light of the disputed and confusing evidence presented on this issue, we cannot say that the court erred in failing to identify any nonmarital component of either asset. Therefore, the trial court was permitted to award both properties to Karen while considering their combined $141,500 value as marital property, subject to distribution. *See Bond,* 2011 ME 54, ¶ 10, 17 A.3d 1219.

[¶ 21] Because there is insufficient evidence in the record to support a finding that $300,000 of the assets awarded to Karen were marital property, the record will not support an award of $300,000 to John in order to create an equitable division of the marital estate. We vacate that portion of the trial court's judgment and remand to allow the trial court to determine whether any sum—within the value of the marital estate—should be awarded to John to create an equitable division of the marital estate. As always, we are mindful "that an equal division is not necessarily an equitable one." *Spooner v. Spooner,* 2004 ME 69, ¶ 27, 850 A.2d 354 (citing *Doucette v. Washburn,* 2001 ME 38, ¶ 24, 766 A.2d 578). On remand, the trial court may permit the parties to present additional evidence or argument, or it may issue a decision based on the evidence and arguments already presented.

C. Action on Motion to Enforce Preliminary Injunction

[¶ 22] As set forth above, following her notice of appeal from the divorce judgment, Karen moved the trial court to enforce the preliminary injunction, which she alleged John violated by removing her from his health insurance policy. Karen's motion raises two related issues. First, whether the divorce court had jurisdiction to consider her motion pursuant to M.R.App. P. 3(b) and M.R. Civ. P. 62(a) (2011) after she filed her notice of appeal, and second, whether the preliminary injunction requiring John to maintain her health insurance was effective after the District Court issued its divorce judgment.

[¶ 23] When Karen began this divorce proceeding more than four years ago, a preliminary injunction took effect, pursuant to 19–A M.R.S. § 903(1)(B)(3) and M.R. Civ. P. 104. That injunction enjoined John from "voluntarily removing [Karen] from a policy of health insurance that provides coverage for [her]." 19–A M.R.S. § 903(1)(B)(3). Despite that injunction, John allowed Karen's coverage to briefly lapse in October 2008. In an April 2009 order, the court (Ellsworth, *R. Murray, J.*) required John to reimburse Karen for costs she incurred as a result of that lapse.

[¶ 24] At trial in May 2010, Karen again asserted that she had incurred costs during the pendency of the divorce as a result of John's actions with regard to her health insurance coverage. In its August 16, 2010, judgment, however, the court specifically declined to reimburse Karen for these additional claims and ended John's obligation to provide health insurance for Karen.

[¶ 25] Karen's December 2010 motion to "enforce" the preliminary injunction asserts that John removed her from his policy after the August 16, 2010, divorce judgment. In its order finding it was not authorized to consider Karen's motion because of the pending appeal, the court specifically noted that M.R.App. P. 3(b), which delineates what trial courts can and cannot do during the pendency of an appeal, did not permit a court "to enforce a Preliminary Injunction pending appeal."

[¶ 26] As the court correctly noted, trial courts retain only limited jurisdiction to act once a case has been appealed. *See* M.R.App. P. 3(b). Determining precisely where the court may or may not act while an appeal is pending is even more complicated in family cases, which always involve preliminary injunctions, and which frequently involve orders pending judgment.

[¶ 27] When a party asks a trial court to enforce an order during an appeal, the court must first determine if the order was stayed pending the appeal. M.R. Civ. P. 62 reads:

(a) Automatic Stay, Exceptions—Injunctions and Receiverships. Except as stated herein, no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 21 days after its entry or until the time for appeal from the judgment as extended by the rules governing appeals has expired. *Unless otherwise ordered by the court,* an interlocutory or final judgment in an action for an injunction or in a receivership action or *an order relating to the care, custody and support of minor children or to the separate support* or personal liberty *of a person* or for the protection of a person from abuse or harassment *shall not be stayed during the period after its entry and until an appeal is taken or during the pendency of an appeal.* The provisions of subdivision (d) of this rule govern the suspending, modifying, restoring or granting of an injunction during the pendency of an appeal.

. . . .

(d) Injunction Pending Appeal. When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

M.R. Civ. P. 62. (Emphasis added). Subsection (a) excepts certain trial court orders, specifically including those involving spousal support, from the usual appellate stay. In its discretion, a trial court could choose to stay any order, including its entire judgment, pending appeal, pursuant to subsections (a) and (d). *See Adams v. Adams,* 620 A.2d 286, 287–88 (Me.1993). But if it has not stayed the portions of its judgment subject to M.R. Civ. P. 62(a), those provisions take effect and remain in effect throughout the appeal period. *See Most v. Most,* 477 A.2d 250, 263–64 (Me. 1984); *see also Sylvester v. Sylvester,* 429 A.2d 223, 227 (Me.1981).

[¶ 28] When a divorce judgment terminates a temporary order of spousal support by ordering a payment in lieu of support, or when the level of support is reduced to reflect a weighted division of property, a trial court may well decide to stay those portions of its judgment—leaving the previously ordered, temporary payment scheme in place—if one of the parties files an appeal. *See Adams,* 620 A.2d at 287–88.

[¶ 29] Here, the divorce judgment implicitly ended John's obligation to provide health insurance to Karen and the court did not stay that portion of its order. *See Tibbetts v. Tibbetts,* 406 A.2d 78, 81–82 (Me.1979). Absent the trial court's ex-

press determination otherwise, pursuant to M.R. Civ. P. 62(a), the court's order ending John's obligation to provide health insurance for Karen was not stayed pending appeal.[8] *Adams,* 620 A.2d at 287.

[¶ 30] Pursuant to M.R. Civ. P. 62(d), a court does have the discretion to "restore" a preliminary injunction during the pendency of an appeal and, if read generously, Karen's motion could be construed as a request to restore the preliminary injunction. From that vantage point, the trial court could have considered the merits of Karen's request.

[¶ 31] Even if the court had considered the merits of Karen's request however, its response should have been to deny the motion. Health insurance coverage is a form of support. *See generally Levasseur v. Levasseur,* 2010 ME 5, 987 A.2d 528 (discussing the provision of health insurance in the child support context). When one adult is required to provide health insurance for another adult, it is considered spousal support. *See* 19-A M.R.S. § 951–A(5)(G) (listing health insurance as a factor to be considered in awarding support).

[¶ 32] When, as here, the divorcing couple's premarital agreement unequivocally bars the awarding of spousal support, neither spouse can be required to provide the other with health insurance. The divorce judgment ended John's obligation to provide health insurance, and that portion of the judgment was not stayed pending appeal pursuant to M.R. Civ. P. 62(a).

D. Attorney Fees

[¶ 33] "We review the divorce court's order regarding attorney fees for an abuse of discretion." *Ellis v. Ellis,*

---

**8.** It is incumbent on the parties to move the court to act should they wish to avoid the usual effect of M.R. Civ. P. 62(a).

2008 ME 191, ¶ 26, 962 A.2d 328. The trial court found, and the record supports, that, "[b]oth parties contributed substantially to the greater than usual cost of litigation." Given the contentiousness demonstrated by the parties' motion practice, we conclude that the trial court did not abuse its discretion in ordering each party to pay his or her own attorney fees. *See Ellis*, 2008 ME 191, ¶ 26, 962 A.2d 328 (noting that the trial court may take into account parties' conduct during litigation in awarding attorney fees).

[¶ 34] To the extent Karen claims other errors in the trial court, she has waived those issues through her failure to develop them.[9] *See In re David H.*, 2009 ME 131, ¶ 31 n. 6, 985 A.2d 490 (citing *Mehlhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290).

The entry is:

The District Court's judgment is affirmed in part and vacated in part. Case remanded to the District Court solely to reconsider the equitable distribution of the assets discussed in this opinion. Judgment is affirmed in all other respects.

---

9. For example, Karen perfunctorily claims that the District Court interfered with her right of contract in violation of the Maine Constitution and United States Constitution. She waives this argument, but in any event, it lacks merit because Karen and John executed their premarital agreement after the Uniform Premarital Agreement Act took effect. *See Hoag v. Dick*, 2002 ME 92, ¶ 10, 799 A.2d 391 (declining to apply UPAA to agreement executed before effective date of legislation).