2008 ME 7

**ESTATE OF James MARTIN Jr.**

Supreme Judicial Court of Maine.

Argued: Oct. 19, 2007.
Decided: Jan. 15, 2008.

**814**

Alan F. Harding, Hardings Law Office, Presque Isle, for appellant.

Richard D. Solman, Solman & Hunter, P.A., Caribou, for appellee.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

LEVY, J.

[¶ 1] Donna Martin and James Martin signed a premarital agreement comporting with the requirements of the Uniform Premarital Agreement Act (UPAA), 19-A M.R.S. §§ 601–611 (2007), two weeks before their wedding in June 2004. James died in November 2005. In this appeal we review a declaratory judgment of the Aroostook County Probate Court (*Dunleavy, J.*) finding the premarital agreement to be enforceable against Donna by James's estate. We affirm the judgment.

## I. FACTUAL BACKGROUND

[¶ 2] James and Donna were married in 2004, in South Africa, after having lived together for seven years. Donna testified that they discussed the idea of a premarital agreement prior to their marriage and that she was in favor of it. Donna told James she did not want any of his property, and James told his attorney he wanted a premarital agreement in order to protect the children of his first marriage.

[¶ 3] Two weeks before their wedding, Donna and James signed a premarital agreement before a notary public. Donna told the notary public that she had read the agreement and that she had no questions. The agreement contained several prefatory recitals, including that each party had made "full disclosure" to the other party of all property and assets, and their values; that the agreement was drafted by James's attorney; and that Donna "acknowledges having been given the opportunity to review this agreement with an attorney of her choice and has voluntarily executed this agreement after/without consultation with an attorney." In the agreement, James agreed to designate Donna as the beneficiary of his UNUM life insurance policy and to grant her a life estate in his Eagle Lake residence in the event he predeceased her. The agreement otherwise provided that upon the death of either party, "no claim by inheritance, descent, surviving spouse award, homestead, or maintenance shall be made by either of the parties against the other or against the estate of the other." [1] Donna did not con-

---

1. The relevant provision of the Agreement continues:

   Each of the parties separately waives any and all rights by, homestead, surviving spouse award, inheritance, descent, or any other marital right arising by virtue of statute or otherwise in and to any parcel of the estate now owned and possessed by the other, and agrees and consents that each shall have full power and control in all respects to exercise free and undisputed ownership, management, and disposition of each of such estates and increases thereto now owned and possessed by the parties; and each of such parties waives and renounces any legal and statutory rights that might, under any law, be set up against any part of the estate of the other and consents that the estate of each shall descend or be disposed of by will to the heirs or legatees or devisees of each of the parties, free and clear of any claim by inheritance, surviving

fer with an attorney before she signed the agreement.

[¶ 4] James died in November 2005, after seventeen months of marriage. He was survived by the children of his first marriage. Soon after James's death, two different writings were offered for probate. In December 2005, James's cousin John Martin filed for informal probate of a will that had been signed by James and witnessed in June 1980, and that appointed John the personal representative of the estate. In January 2006, Donna filed a petition for the formal probate of a second writing purportedly signed by James and witnessed in February 1985, and moved to be named the personal representative of the estate. She asserted that she had priority as the personal representative due to her status as James's surviving spouse, even though the second writing explicitly nominated the Merrill Trust Company and James's first wife as co-personal representatives, and his daughters Lillian Roy and Paula Martin in the alternative. *See* 18–A M.R.S. § 3–203(a) (2007) (stating that persons nominated by will take priority over a surviving spouse).

[¶ 5] In March 2006, John filed a petition for a declaratory judgment that requested the court to declare Donna and James's premarital agreement valid and enforceable under Maine law.[2] In July, the parties entered into a stipulation whereby James's daughter, Lillian Roy, and Felch & Company, LLC, were substituted for John as the co-personal representatives of the estate, with Lillian having complete control over any litigation regarding the validity of the premarital agreement.

[¶ 6] Following an evidentiary hearing, the court determined that the premarital agreement was valid and enforceable. The court ruled that the validity of the agreement was governed solely by the standards contained in the enforcement provision of the UPAA, 19–A M.R.S. § 608,[3]

---

spouse award, homestead, maintenance, or any claim otherwise given by law to a husband and wife.

2. The Probate Court entertained the estate's petition for a declaratory judgment months before Donna had even filed a claim against the estate. The customary procedure, however, is for a petitioner to apply for his or her claim, at which time the personal representative pleads the premarital agreement as an affirmative defense. *See Estate of Barrows,* 2006 ME 143, ¶ 8, 913 A.2d 608, 610–11; *Hoag v. Dick,* 2002 ME 92, ¶ 5, 799 A.2d 391, 392; *see also* Mitchell & Hunt, *Maine Probate Procedure: Guide to Official and Recommended Forms* § 4.19.1 at 4–106 (2007).

3. Title 19–A M.R.S. § 608 (2007) reads:
   **1. Not enforceable.** A premarital agreement is not enforceable *if the party against whom enforcement is sought* proves that:
   **A.** That party did not execute the agreement voluntarily; or
   **B.** The agreement *was unconscionable* when it was executed *and,* before execution of the agreement, that party:

(1) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
(2) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
(3) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.
   **2. Support required.** If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility.
   **3. Unconscionability.** An issue of unconscionability of a premarital agreement must be decided by the court as a matter of law.

and not also by the common law presumption of fraud we previously employed in conjunction with the waiver provision of the Probate Code, 18–A M.R.S. § 2–204 (2007).[4] In accordance with section 608 of the UPAA, the court assigned to Donna the burden of proving either: (1) that the agreement was executed involuntarily, or (2) that the agreement was unconscionable when executed and that Donna lacked actual or constructive knowledge of James's financial situation. *See* 19–A M.R.S. § 608(1)(A), (B). Based on its finding that Donna had told the notary public that she had read the premarital agreement and that she had no questions, the court concluded that she voluntarily signed the agreement and that Donna had therefore failed to prove the first basis for invalidity under 19–A M.R.S. § 608(1). The court further found that there was no evidence of any threats, fraud, overreaching, duress, or coercion made to induce Donna into signing the premarital agreement and, therefore, Donna had not established the second basis for invalidity under section 608(1) either. The court also found Donna's testimony that she lacked knowledge of James's assets as not credible, and that there was fair disclosure prior to execution. Because Donna failed to prove either of the bases for invalidating a premarital agreement under 19–A M.R.S. § 608(1), the court concluded: "Donna has waived in writing her right to claim to any share of the Estate of James Martin, Jr., including any claims for homestead allowance, family allowance, elective share, pretermitted spouse, intestate share or otherwise."

[¶ 7] Donna also urged the court to order the rescission of the premarital agreement because, as of his death, James had failed to designate Donna as the beneficiary of his UNUM life insurance policy as required by the agreement. The court rejected this argument, concluding that the agreement's provision regarding the life insurance policy was contractual in nature and not a condition precedent to the enforcement of the premarital agreement. This appeal followed.

## II. LEGAL ANALYSIS

[¶ 8] Donna contends that any premarital agreement by which a spouse purports to waive the right of election and the rights to homestead allowance, exempt property, and family allowance under the Probate Code must not only comply with section 608 of the UPAA, but is also subject to the common law presumption of fraud that we have previously treated as implicit in the waiver provision of the Probate Code, 18–A M.R.S. § 2–204. *See Hoag v. Dick*, 2002 ME 92, ¶¶ 13–14, 799 A.2d 391, 394–95. The estate contends that section 608 of the UPAA establishes the exclusive standards governing the enforceability of premarital agreements as

(Emphasis added.)

4. Title 18–A M.R.S. § 2–204 (2007) reads:
    The right of election of a surviving spouse and the rights of the surviving spouse to homestead allowance, exempt property and family allowance, or any of them, may be waived, wholly or partially, before or after marriage, by a written contract, agreement or waiver signed by the party waiving *after fair disclosure*. Unless it provides to the contrary, a waiver of "all rights," or equivalent language, in the property or estate of a present or prospective spouse or a complete property settlement entered into after or in anticipation of separation or divorce is a waiver of all rights to elective share, homestead allowance, exempt property and family allowance by each spouse in the property of the other and a renunciation by each of all benefits which would otherwise pass to him from the other by intestate succession or by virtue of the provisions of any will executed before the waiver or property settlement.
    (Emphasis added.)

they pertain to the waiver of these rights. To assess these competing views, we consider: (A) section 2–204 of the Probate Code, the common law presumption of fraud, and section 608 of the UPAA; and (B) the application of section 608 to the facts of this case. Finally, we address Donna's contention that because James failed to designate her as the beneficiary of his UNUM life insurance policy, the court should have ordered the rescission of the premarital agreement.

A. Section 2–204 of the Probate Code, the Common Law Presumption of Fraud, and Section 608 of the UPAA

[¶ 9] The specific question presented is whether section 608 of the UPAA provides the exclusive standard for determining the validity of a waiver of the spousal rights enumerated in section 2–204 of the Probate Code or whether the common law presumption of fraud associated with section 2–204 also governs this question. For the reasons that follow, we conclude that the common law presumption has been superceded by the standards contained in section 608 of the UPAA.

[¶ 10] Probate Code section 2–204, entitled "Waiver of right to elect and of other rights," provides that a spouse may waive certain rights after having received "fair disclosure." We have previously construed section 2–204's fair disclosure requirement as incorporating Maine's common law standards governing premarital agreements. *See Hoag*, 2002 ME 92, ¶ 13–14, 799 A.2d at 394–95. Under the

common law, a premarital agreement is presumed to be the product of fraud if it is established that the agreement's provisions for the surviving spouse are clearly or grossly disproportionate to the deceased spouse's wealth. *Rolfe v. Rolfe*, 125 Me. 82, 83, 130 A. 877, 878 (1925). Once the presumption of fraud is established, the burden of proof shifts to the party seeking to enforce the agreement "to prove fairness, notice, understanding and adequacy." *Id.*[5]

[¶ 11] Our common law presumption of fraud reflects the traditional societal distrust of premarital agreements that failed to make "adequate provision" for the spouse against whom enforcement was sought. *Id.; see also Kline's Estate*, 64 Pa. 122, 126 (Pa.1870); *Pierce v. Pierce*, 71 N.Y. 154, 157–59 (1877); *Graham v. Graham*, 143 N.Y. 573, 38 N.E. 722, 724 (1894). This distrust rested upon the premise that "[a]fter betrothal a woman is presumed to be subject in such matters to the influence of her prospective husband...." *Denison v. Dawes*, 121 Me. 402, 404, 117 A. 314, 315 (Me.1922). Because the common law presumed that a prospective husband wielded disproportionate influence over his intended wife, "[e]quity guard[ed] with jealous care the rights of a wife who, without competent and independent advice, surrenders the rights secured to her by statute under an agreement with the husband." *Id.* at 409, 117 A. at 317.

[¶ 12] The common law view that men necessarily have disproportionate influence

---

5. As more fully stated in *Rolfe v. Rolfe:*

[It] is well settled in Maine and generally so throughout the country; that certain cardinal principles universally obtain, such as the principle that there shall be no fraud or imposition practiced, that full and complete disclosure shall be made and that adequacy in provision for the spouse shall result; that gross disproportion of such adequacy may

invalidate such agreement; that the natural confidence of the relations of the parties shall not be violated; *that where gross disproportion results fraud will be presumed, and that the burden is upon him who sets up an ante-nuptial agreement to prove fairness, notice, understanding and adequacy.*

125 Me. 82, 83, 130 A. 877, 878 (1925) (emphasis added).

over their prospective wives is an anachronism. A gender-based presumption regarding spousal influence is contrary to the law's current embrace of gender equality. Reasoned judgments about an individual's susceptibility to undue influence should no longer be based on a stereotype that has no basis in fact.[6]

[¶ 13] With its enactment of the Uniform Premarital Agreement Act in 1987, the Legislature specifically adopted standards governing the creation and enforcement of premarital agreements. P.L. 1987, ch. 302 (effective Sept. 29, 1987) (recodified at 19-A M.R.S. §§ 601-611 (2007)). The UPAA applies to all premarital agreements executed in Maine after September 28, 1987. *See Hoag*, 2002 ME 92, ¶¶ 9-10, 799 A.2d at 393. Under the UPAA, prospective spouses may, in contemplation of marriage, enter into an agreement regarding a wide variety of rights and obligations—including the disposition of property upon death. 19-A M.R.S. § 604(3), (8).

[¶ 14] The UPAA breaks from section 2-204 and the common law in several key respects. First, by explicitly placing the burden of proof on the party seeking to avoid enforcement of the premarital agreement, the UPAA departs from the presumption and burden shifting traditionally used to determine whether "fair disclosure" has been provided. *See* 19-A M.R.S. § 608(1). Second, the UPAA "defines more thoroughly than [section 2-204 of the UNIFORM PROBATE CODE] when a premarital agreement may be enforced, and it also governs all types of premarital agreements, not just those that contain a waiver of an elective share." *Estate of Shinn*, 394 N.J.Super. 55, 925 A.2d 88, 92 (App.Div. 2007), *cert. denied*, 192 N.J. 595, 934 A.2d 637 (2007). Finally, the Legislature mandated that we construe the UPAA in a manner consistent with its purpose of making uniform among the states the law governing premarital agreements. *See* 19-A M.R.S. § 611.

[¶ 15] Section 608 identifies two ways in which a party may avoid enforcement of an agreement. First, a party may prove that the party "did not execute the agreement voluntarily." 19-A M.R.S. § 608(1)(A). Second, a party may prove that the agreement "was unconscionable when it was executed and, before execution of the agreement," the party: (1) "[w]as not provided a fair and reasonable disclosure of the property or financial obli-

---

**6.** We have had occasion to consider the common law presumption of fraud in two recent decisions. In *Hoag*, a divorce case, we affirmed a judgment that denied enforcement of a premarital agreement that largely eliminated a spouse's share of the marital property and was presented to the spouse for signature on her wedding day, thus depriving her of the opportunity to "obtain advice from independent legal counsel regarding the document's terms." 2002 ME 92, ¶ 16, 799 A.2d at 395. The premarital agreement at issue in *Hoag* had been executed before the enactment of the UPAA in Maine. *See id.* ¶¶ 3, 9, 799 A.2d at 392-93. We expressly declined to apply the UPAA to the agreement in *Hoag*, noting that to do so would violate the Contract Clause of the Maine Constitution. *Id.* ¶ 10, 799 A.2d at 393; *see* ME. CONST. art. I, § 11.

More recently, in *Estate of Barrows*, 2006 ME 143, 913 A.2d 608, we determined the enforceability of a premarital agreement executed after the effective date of the UPAA without considering the UPAA, instead applying section 2-204 and the common law. Our decision, though, focused on whether the premarital agreement was ambiguous and whether the terms of the agreement constituted a waiver of the widow's spousal rights. *See id.* ¶¶ 11-23, 913 A.2d at 611-14. Neither the parties nor our decision addressed whether the surrounding circumstances made any potential waiver unenforceable. Because neither party raised the issue of enforceability, we had no reason to consider whether the UPAA supercedes our previous application of the common law to breathe life into the "fair disclosure" language of section 2-204.

gations of the other party;" (2) "[d]id not voluntarily and expressly waive, in writing, any right to [such a disclosure] beyond the disclosure provided;" and (3) "[d]id not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party." 19–A M.R.S. § 608(1)(B). Section 608 also specifies that "[a]n issue of unconscionability ... must be decided by the court as a matter of law." 19–A M.R.S. § 608(3).

■ [¶ 16] The UPAA reflects greater social acceptance of and comfort with premarital agreements than existed at common law. *See* JESSE DUKEMINIER ET AL., WILLS, TRUSTS, AND ESTATES 451–52 (7th ed. 2005). The common law, through a series of "[p]aternalistic presumptions and protections that arose to shelter women from the inferiorities and incapacities which they were perceived as having," presumed fraud based on a determination, as a matter of fact, that an agreement's provisions for a surviving spouse were grossly disproportionate to the deceased spouse's wealth. *Simeone v. Simeone*, 525 Pa. 392, 581 A.2d 162, 165 (1990). Section 608, on the other hand, views premarital agreements as contracts that should be evaluated under the same standards as used in commercial law. *See* Unif. Premarital Agreement Act § 6, cmt. Accordingly, under the UPAA, enforcement of a premarital agreement should only be denied under two circumstances. First, if a court finds that a party did not execute the agreement voluntarily. 19–A M.R.S. § 608(1). Second, if a court determines that the agreement is, as a

matter of law, unconscionable and the party did not waive disclosure or have a reasonable opportunity for adequate knowledge of the other's financial situation, as more fully provided in section 608.

■ [¶ 17] With the enactment of the UPAA in 1987, the Legislature intended the enforceability of premarital agreements to be determined based on section 608. *See* 19–A M.R.S. §§ 608, 611. Section 608 applies to premarital agreements not only when spouses divorce, but also upon the death of a spouse. 19–A M.R.S § 604. It is therefore consistent with the Legislature's purpose of providing guidance to the public in the creation and enforcement of premarital agreements to treat section 608 of the UPAA as the controlling determinant of whether a premarital agreement's waiver of the spousal rights enumerated in 2–204 is enforceable.[7] Accordingly, we conclude, as did the Probate Court, that as applied to premarital agreements, the common law has been superseded by the standards contained in section 608 of the UPAA for purposes of determining whether section 2–204's requirement of "fair disclosure" has been met.

B. Application of Section 608

■ [¶ 18] We review findings of law de novo and factual findings for clear error. *Hoag*, 2002 ME 92, ¶ 7, 799 A.2d at 393; *Williams v. St. Pierre*, 2006 ME 10, ¶ 8, 889 A.2d 1011, 1013. The issue of unconscionability is a question of law we review de novo, while the Probate Court's

7. As the estate also points out, when the National Conference of Commissioners on Uniform State Laws revised the UNIFORM PROBATE CODE in 1993, it revised section 2–204 and renumbered it as section 2–213. *See* Unif. Probate Code § 2–213 (1993). As revised, the statute expressly incorporates the standards of section 608 of the UPAA to determine the enforceability of a premarital agreement. This revision makes explicit what was implicit prior to the revision. Although Maine has not yet adopted the 1993 revision of the UNIFORM PROBATE CODE, the changes to section 2–204 found in the revision support the estate's contention that section 608 was meant to govern the effectiveness of a waiver of the spousal rights enumerated in section 2–204.

820

finding of fair disclosure due to actual or constructive knowledge is a factual determination reviewed for clear error. 19–A M.R.S. § 608(1). Section 608 does not require actual disclosure for a premarital agreement to be enforceable. 19–A M.R.S. § 608(1)(B). The party seeking to avoid enforcement must also show that the agreement was unconscionable, she did not waive in writing any right to such a disclosure, and she did not have and could not have reasonably obtained adequate knowledge of the other's financial situation. *Id.*

[¶ 19] Contrary to Donna's contention, the Probate Court did not clearly err in concluding that Donna possessed actual or constructive knowledge of James's finances. It is undisputed that James and Donna cohabitated for seven years prior to their marriage; Donna had access to detailed financial records as of the time of James's divorce from his first wife; James routinely left his financial statements in plain sight on the kitchen counter; the premarital agreement states that "[e]ach of the parties has made a full disclosure to the other party of all of his or her property and assets[;]" and Donna declared to the notary public that she had read the premarital agreement and had no questions. The Probate Court further found that Donna's testimony that she lacked knowledge of James's finances was not credible. From these facts, the Probate Court could rationally find not only that Donna possessed constructive knowledge of James's finances, but also that she possessed actual knowledge of his finances. Therefore, the court did not clearly err in finding she failed to prove that she lacked "fair disclosure" before signing the premarital agreement.

C.  James's Failure to Fully Perform His Contractual Obligations

[¶ 20] Contrary to Donna's additional contention, James's failure to des-

ignate her as the beneficiary of his life insurance policy—as he agreed to do in the premarital agreement—does not warrant rescission of the agreement. When prospective spouses enter into a premarital agreement, each must perform their duties under the contract before they may claim the benefits of the agreement. *Wilson v. Wilson,* 157 Me. 119, 126, 170 A.2d 679, 683 (Me.1961). Nevertheless, "equity will not compel a rescission where there has been partial performance" of the premarital agreement. *Id.* (quotation marks omitted).

[¶ 21] Donna does not dispute that James partially performed his obligations under the agreement. We have previously said that marriage is the highest consideration known to the law, *Wentworth v. Wentworth,* 69 Me. 247, 253 (1879), and James and Donna arguably performed the most important condition of the contract by entering into the marriage state. James also provided Donna with a life estate in the Eagle Lake home, as required by the premarital agreement. Because there has been partial performance, equity does not demand that the courts set aside the premarital agreement. Furthermore, the personal representative has attempted to tender the proceeds of the UNUM life insurance policy to Donna— her remedy in a suit for breach of the contract—but this tender was rejected.

The entry is:

Judgment affirmed; remanded for further proceedings consistent with this opinion.