MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2022 ME 13
Docket:      Sag-21-77
Argued:      November 3, 2021
Decided:     February 15, 2022

Panel:       STANFILL, C.J., and MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and
             CONNORS, JJ.


HELGE RIEMANN

v.

KRISTINA A. TOLAND


HUMPHREY, J.

[¶1]  In this appeal, we consider whether a provision in a premarital

agreement waiving the parties' right to seek attorney fees is enforceable when

the parties litigate the best interest of their child.

[¶2]  Helge Riemann appeals from a divorce judgment entered by the

District Court (West Bath, *Raimondi, J.*) in which the court adopted a referee's

findings and recommendations that Kristina A. Toland be awarded (1) primary

residence of the parties' minor child even if Toland relocates from Maine to

Ohio and (2) attorney fees.  Because we conclude that the referee did not err or

abuse her discretion in determining the child's primary residence and that the

attorney-fee-waiver  provision  in  the  parties'  premarital  agreement  is

2

unenforceable as applied to their litigation of parental rights, we affirm the judgment in all respects.

## I. BACKGROUND

[¶3] On October 25, 2018, Riemann filed a complaint for divorce. Toland answered and counterclaimed, requesting, in part, that the court determine the parties' parental rights and responsibilities and allocate attorney fees. In February and August 2019, the court held two interim hearings pending final resolution of the divorce. After the first interim hearing, held on February 11, 2019, the court (*Adamson, M.*) entered an order pending divorce that, in relevant part, awarded primary residence of the child to Toland while also setting a contact schedule for Riemann. The focus of the second hearing was Toland's desire to continue to have interim primary residence of the child and relocate, with the child, to Ohio.[1]

[¶4] In December 2019, Toland filed a motion for prospective attorney fees, arguing that a provision in the parties' premarital agreement waiving their rights to seek attorney fees from the other party was void and unenforceable

---

[1] Following the second interim hearing, the court entered an interim order on November 4, 2019, finding that the child should reside primarily with Toland regardless of whether Toland moves to Ohio, but that the child could not relocate with her until Toland secured employment in Ohio that was "meaningfully connected to her field."

because it "limits the ability of a spouse to effectively litigate the issue of custody or support." In April 2020, pursuant to a written stipulation and agreement of the parties, the court appointed a referee "to conduct all future proceedings in this case."

[¶5] In May 2020, Toland filed a motion in limine seeking an order allowing her "to request an award of reasonable attorney's fees . . . incurred litigating issues of parental rights and responsibilities." Riemann opposed both motions, arguing that a waiver of attorney fees in the parties' premarital agreement was enforceable under Maine law.

[¶6] In June 2020, a three-day final hearing was held before the referee. The focus of the proceeding was again Toland's desire to be awarded primary residence of the child even if she relocated to Ohio. The referee issued a report in September 2020 and made the following findings, which are supported by competent evidence in the record. *See Akers v. Akers*, 2012 ME 75, ¶ 3, 44 A.3d 311.

[¶7] In 2012, Toland moved to Maine for a teaching position as a postdoctoral fellow at Bowdoin College.[2] Sometime thereafter, she met and

---

[2] Toland had recently received her master's and doctorate degrees.

4

began a relationship with Riemann, who had a successful medical practice in Brunswick.

[¶8] In January 2015, Riemann and Toland, each represented by separate counsel, executed a premarital agreement that included a provision requiring each party to "bear their own costs and attorney's fees in the event . . . either party file[d] a Complaint."[3] Riemann and Toland were married approximately two weeks after executing the premarital agreement.

[¶9] Following the birth of their child in early 2015, Toland took an eight-week maternity leave from her teaching position, and Riemann reduced his work schedule. At the conclusion of Toland's leave, Toland and Riemann decided that Toland would stay at home and care for the child full-time rather than return to work.

[¶10] After Riemann filed for divorce, Toland informed him that she wanted to relocate to Ohio and return to teaching at the college level. Her prospects for employment in her field are greater in Ohio, where Toland's parents live and where she and the child would have family support while living with them. Toland is committed to facilitating contact between the child and

---

[3] Neither party disputes that the provision waiving attorney fees, if enforceable, applies to a complaint for divorce.

Riemann, and she acknowledged that she would not relocate if the child could not accompany her to Ohio. Riemann sought either primary or shared primary residence in Maine, proposing that he hire a nanny as necessary for childcare. Both parents love the child, want what is best for the child, and can meet the child's daily needs.

[¶11] The child was five years old at the time of the trial and, although she was attending a pre-kindergarten school in Freeport, did not have close relationships in her community. Toland has historically performed most of the caretaking for the child, and the child has strong bonds with both parents. The hardest loss for the child if Toland moved to Ohio would be the loss of frequent contact with Riemann, though the GAL opined that the child would adjust more easily to the loss of frequent contact with Riemann than she would to a loss of frequent contact with Toland.

[¶12] The referee submitted her report to the District Court on September 8, 2020. The report reflects the referee's full consideration of the statutory factors relevant to application of the standard governing the determination of the best interest of the child, *see* 19-A M.R.S. § 1653(3)(A)-(B), (E)-(F), (H), (N) (2021), and of all the evidence, including the opinion of the GAL

and competing testimony offered by the parties' experts regarding the potential effect relocation could have on the child's psychological well-being.

[¶13] The referee concluded that it was in the child's best interest to live primarily with Toland in Ohio while maintaining contact with Riemann. The referee also determined that, in the circumstances of this case, Toland should be awarded attorney fees because the parties' waiver in their premarital agreement of the right to seek attorney fees was against public policy and therefore unenforceable. In response to the referee's report, Riemann filed motions to amend, to reconsider, and to make further findings, which the referee denied.

[¶14] Riemann filed an objection to the referee's report with the court, challenging the referee's award to Toland of (1) primary residence of the child in Ohio and (2) attorney fees. Following a hearing on February 11, 2021, the court (*Raimondi, J.*) adopted the referee's report in its entirety and entered it as a final judgment that same day. The court concluded that the referee's findings of fact were not clearly erroneous, M.R. Civ. P. 53(e)(2), and agreed with the referee's legal conclusion as to the unenforceability of the provision for the waiver of attorney fees in the parties' premarital agreement. Riemann timely appealed. *See* 19-A M.R.S. § 104 (2021); M.R. Civ. P. 123; M.R. App. P. 2B(c)(1).

## II. DISCUSSION

[¶15] "When a trial court accepts a report of a referee, the findings of the referee become the trial court's findings, and we review those findings directly." *Wechsler v. Simpson*, 2016 ME 21, ¶ 12, 131 A.3d 909 (quotation marks omitted). The referee's findings are entitled to substantial deference because of the referee's opportunity to observe and assess the witnesses' testimony, and we review the referee's factual findings for clear error. *Id.* Because a motion for further findings was timely filed and denied, we can consider only the express factual findings of the referee in reviewing the ultimate judgment. *Klein v. Klein*, 2019 ME 85, ¶ 6, 208 A.3d 802.

### A. Relocation and Primary Residence

[¶16] Riemann contends that the evidence does not support the award of primary residence to Toland in Ohio and that the referee failed to conduct the requisite balancing of constitutional rights, which Riemann argues should be based on whether a parent has compelling reasons for relocation and other "objective" factors. Riemann also contends that the referee's best interest analysis focused only on whether the child should live with Riemann in Maine or with Toland in Ohio and was thus based on the "false premise" that Toland

8

would move to Ohio without the child, which Toland had said she would not do.[4]

[¶17]  We review the referee's recommendation as to parental rights for an abuse of discretion.  *Wechsler*, 2016 ME 21, ¶ 12, 131 A.3d 909. A determination of parental rights and responsibilities must be based on the best interest of the child as that standard is set forth in 19-A M.R.S. § 1653(3). *See, e.g.*, *Vibert v. Dimoulas*, 2017 ME 62, ¶ 15, 159 A.3d 325.  Applying the best interest standard when parental relocation is at issue, the referee must strike a balance between "a custodial parent's right to engage in interstate travel and to decide where the parent and child will reside[] and a non-custodial parent's right to have continuing and meaningful parent/child contact with the child." *Light v. D'Amato*, 2014 ME 134, ¶ 20, 105 A.3d 447 (quotation marks omitted). The referee must therefore "balance the rights and interests of the parents

---

[4] Riemann also argues that the referee erroneously considered Toland to be the primary caregiver and failed, in denying his request for "shared primary residential care," to explain why it is not in the best interest of the child.  *See* 19-A M.R.S. § 1653(2)(D)(1) (2021).  These arguments are unpersuasive.  A fact finder's consideration of a parent's historical contributions to the child's care is not error when it relates to the best interest of the child. *See Wechsler v. Simpson*, 2016 ME 21, ¶¶ 7, 20, 131 A.3d 909 (affirming the fact finder's best interest determination when one parent's historical role as the primary caregiver was considered in that analysis); *Low v. Low*, 2021 ME 30, ¶¶ 5, 10, 251 A.3d 735 (same); *see also* 19-A M.R.S. § 1653(3)(B).  And where, as here, a fact finder expressly concludes that the best interest of the child is served by granting primary residence to one parent, that conclusion sufficiently explains the reasons why shared primary residential care is not in the child's best interest.  *See Wechsler,* 2016 ME 21, ¶¶ 20-21, 131 A.3d 909.  We have also noted that section 1653 "does not define 'shared primary residential care' or explain how it might differ from an award of primary residence to one parent with rights of contact to the other."  *Id.* ¶ 19.

while taking into full consideration the child's best interest." *Low v. Low*, 2021 ME 30, ¶ 9, 251 A.3d 735.

[¶18] Here, the referee did exactly that. The referee articulated the specific best interest factors that were important to this case, *see* 19-A M.R.S. § 1653(3)(A)-(B), (E)-(F), (H), (N), and made findings as to each that are supported by substantial record evidence, including expert testimony assessed and weighed carefully by the referee, *see Sloan v. Christianson*, 2012 ME 72, ¶ 33, 43 A.3d 978 ("[D]eterminations of the weight and credibility to assign to the evidence are squarely in the province of the fact-finder.").

[¶19] The referee considered the age of the child, finding that she was five years old; the stability of any proposed living arrangements, finding that Toland's mother would provide any necessary childcare and that the child was familiar with her grandmother's Ohio home; and the relationship of the child to her parents and to other persons who may affect her welfare, crediting the GAL's belief that it would be more detrimental to the child to be apart from Toland and finding that the child had not formed significant ties in Maine but was particularly close to Toland's mother in Ohio. *See* 19-A M.R.S. § 1653(3)(A)-(B), (E).

[¶20] While assessing the best interest factors fully, the referee carefully balanced the right of each parent to have contact with the child against Toland's right to travel and decide where she and the child will live. The referee considered the parties' motivations, *see* 19-A M.R.S. § 1653(3)(F), finding that Toland believed that the move was the best decision for her and the child, that her employment prospects as an accomplished scholar in her field would be greater in Ohio, and that she and the child both had family support there.[5] The referee furthermore considered the capacity of each parent to facilitate contact with the other parent, *see* 19-A M.R.S. § 1653(3)(H), placing great emphasis on the GAL's belief that Toland would do "whatever possible" to mitigate any disruption to the child's relationship with Riemann.

[¶21] The referee's best interest analysis is distinguishable from that in *Light*, where the court awarded primary residence of the parties' minor child to the mother, who wished to relocate from Maine to Italy, but concluded nonetheless that it was in the child's best interest to remain in Maine if the

---

[5] Contrary to Riemann's argument, the requisite balancing analysis does not require the relocating parent's reason for relocation to "outweigh" the child's best interest, nor do we conclude, as Riemann urges us to, that the parent's reasons must be "compelling" or of a certain kind. Rather, the parent's motivations must be considered among the other relevant factors in assessing the child's best interest. *See In re Marriage of Ciesluk*, 113 P.3d 135, 142 (Colo. 2005) ("[T]he issue in relocation cases is the extent to which the parents' needs and desires are intertwined with the child's best interests."); *Light v. D'Amato*, 2014 ME 134, ¶ 21, 105 A.3d 447 (citing *Ciesluk* to explain that a court's balancing in relocation cases must ultimately focus on the child's best interest).

mother did indeed relocate to Italy. *Light*, 2014 ME 134, ¶¶ 9-10, 105 A.3d 447. Unlike the referee's findings here, the child in *Light* was almost eight years old and had only visited Italy on vacation; the child's mother was unlikely to encourage contact with the father if the child relocated to Italy with her; and the child's stability in her home community of Falmouth was paramount to the child's best interest given the child's relationships there with her therapist, other family members, and a substantial network of friends. *Id*. ¶¶ 3, 8, 10.

[¶22]  Furthermore, and contrary to Riemann's argument, the scope of the referee's best interest analysis under section 1653(3) was not erroneously limited to whether the child should live with Riemann in Maine or with Toland in Ohio.  The best interest factors, 19-A M.R.S. § 1653(3), which the referee assessed fully, do not permit such a narrow inquiry when considering the best interest of a child.  The referee could have, as in *Light*, conditioned the award of primary residence on Toland staying in Maine.  Instead, the referee determined that it was in the child's best interest to live with Toland, whether in Maine or Ohio.

[¶23]   In making that determination, the referee's assumption that Toland might move to Ohio was not error, nor did it create a "false premise" upon which the referee relied in her best interest analysis.  The balancing

analysis assumes the parent's constitutional right to travel, and the central inquiry remains the best interest of the child. *See Light*, 2014 ME 134, ¶¶ 19-22 & n.1, 105 A.3d 447. Toland's admission that she would stay in Maine if the court refused her primary residence of the child in Ohio acknowledges only that the court's ruling would affect her own decision making. *Cf. id.* ¶ 19 (explaining that the court's decision not to award the mother primary residence of the child if she moved to Italy did not constrain her freedom to travel to Italy because, while it might affect her decision making, it did not impair her right to travel and settle in whatever location she chooses).

[¶24] The referee's findings are not clearly erroneous, and we do not disturb the referee's determination, based on those findings, that the child's best interest would be served by living with Toland in Ohio while maintaining contact with Riemann. *See, e.g.*, *Akers*, 2012 ME 75, ¶¶ 6-7, 44 A.3d 311.

**B. Award of Attorney Fees**

[¶25] In domestic relations matters under Title 19-A, "[a] court is authorized to issue an award of reasonable attorney fees based on a determination of the parties' relative capacity to absorb the costs of litigation . . . as well as all relevant factors that serve to create an award that is fair and

just under the circumstances." *Pearson v. Wendell*, 2015 ME 136, ¶ 45, 125 A.3d 1149 (quotation marks omitted); *see* 19-A M.R.S. § 105 (2021).

[¶26]  In their premarital agreement, Riemann and Toland waived the right to seek attorney fees in the event of divorce.  Toland contends that such a waiver is unenforceable as against public policy to the extent that it waives the right to seek attorney fees incurred in litigation of parental rights and responsibilities.  This is an issue of first impression in Maine.

1.   **Standard of Review**

[¶27]  We review conclusions of law de novo, *see, e.g.*, *Est. of Martin*, 2008 ME 7, ¶ 18, 938 A.2d 812, and an award of attorney fees for an abuse of discretion, *Dargie v. Dargie*, 2001 ME 127, ¶ 30, 778 A.2d 353.

[¶28]  Our starting point is Maine's Uniform Premarital Agreement Act (UPAA).  19-A M.R.S. §§ 601-611 (2021).  The interpretation of statutes is a matter of law, and we "construe the whole statutory scheme of which [any] section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved." *York Mut. Ins. Co. v. Bowman*, 2000 ME 27, ¶ 5, 746 A.2d 906 (quotation marks omitted).  "All words in a statute are to be given meaning, and no words are to be treated as surplusage if they can be

reasonably construed." *Cent. Me. Power Co. v. Devereux Marine, Inc.*, 2013 ME 37, ¶ 8, 68 A.3d 1262 (quotation marks omitted).

## 2. Maine's Uniform Premarital Agreement Act

[¶29] Maine's UPAA authorizes individuals to enter into premarital agreements, *see* 19-A M.R.S. § 604, and it applies to all premarital agreements executed in Maine after September 28, 1987, *see Est. of Martin*, 2008 ME 7, ¶ 13, 938 A.2d 812. The UPAA "must be applied and construed to effectuate its general purpose to make uniform the law with respect to [its] subject . . . among states enacting it." 19-A M.R.S. § 611.

[¶30] Section 604 of Maine's UPAA provides that parties may validly contract in a premarital agreement with respect to (1) their rights and obligations to property, (2) the right to buy, sell, or use property; (3) the disposition of property upon the occurrence of specified events; (4) spousal support; (5) the making of a will or trust; (6) a death benefit; (7) the choice of law governing the agreement; and "(8) [a]ny other matter . . . not in violation of public policy." *See* 19-A M.R.S. § 604. In addition to specifying the matters that *can* be the subjects of premarital agreements, section 604 also specifies that a

premarital agreement *cannot* adversely affect the "right of a child to receive support."[6] *Id.*

[¶31]  Because section 604 explicitly precludes parties from contracting as to matters that affect the "right of a child to receive support" but does not mention attorney fees, Riemann contends that the public policy parameters for premarital agreements are already defined by section 604.  He argues that, based on application of the maxim *expressio unius est exclusio alterius*,[7] the absence of any mention of attorney fees implies that a premarital agreement concerning attorney fees is allowed by statute and does not violate public policy.  Section 604(8) provides, however, that parties can contract to "[a]ny other matter" only if the agreement as to that matter does not violate public policy.  *Id.* § 604(8).  Thus, the Legislature *did* provide a guard against parties

---

[6]  Maine's UPAA is closely modeled on the Uniform Premarital Agreement Act (1983).  Maine's legislative history does not clarify what qualifies as "support" as that term is used in the UPAA.  Other jurisdictions interpret "support" within the meaning of their own codifications of the UPAA to mean economic child support.  *See In re Marriage of Best*, 901 N.E.2d 967, 970-71 (Ill. App. Ct. 2009); *In re Marriage of Erpelding*, 917 N.W.2d 235, 238-39 (Iowa 2018).  The Uniform Laws Annotated explains that it "makes clear that an agreement may not adversely affect what would otherwise be the obligation of a party to a child."  Unif. Premarital Agreement Act § 3 cmt., 9C U.L.A. 44 (1983), *superseded by* Unif. Premarital and Marital Agreements Act 9C U.L.A. 13-30 (Supp. 2021).

[7]  This maxim is a rule of statutory interpretation "that [the] express mention of one concept implies the exclusion of others not listed."  *Musk v. Nelson*, 647 A.2d 1198, 1201 (Me. 1994).

contracting as to other matters that, although not specifically prohibited by section 604, violate public policy.

[¶32]    Riemann alternatively argues that section 608 of the UPAA provides the only circumstances under which a premarital agreement is voidable under the Act.  *See* 19-A M.R.S. § 608.  Section 608 provides that a premarital agreement is unenforceable when either (1) it was not executed voluntarily or (2) a court determines that it was unconscionable upon execution and that, before execution, one party lacked knowledge or disclosure of the other party's financial circumstances.  *See id.*  In support, Riemann points to our decision in *Estate of Martin*, in which we said that "enforcement of a premarital agreement should only be denied under [the] circumstances" outlined in section 608.  2008 ME 7, ¶ 16, 938 A.2d 812.  Riemann misapplies section 608 in the case now before us and overreads our holding in *Estate of Martin*, in which we interpreted section 608—not section 604, which we construe here.[8]

[¶33]  Like section 608, our case law thus far has addressed concerns for only the parties' circumstances or positions at the time a premarital agreement

---

[8] In *Estate of Martin*, our statement that "the Legislature intended the enforceability of premarital agreements to be determined based on section 608" was in the narrow context of our conclusion that the common law had been superseded by the standards in section 608 "for purposes of determining whether [the Probate Code's] requirement of 'fair disclosure' ha[d] been met."  2008 ME 7, ¶¶ 9, 17,

is executed. *See Hoag v. Dick*, 2002 ME 92, ¶¶ 3, 16, 799 A.2d 391; *Est. of Martin*, 2008 ME 7, ¶¶ 18-19, 938 A.2d 812. But unlike section 608 and those cases, the public policy concern raised here with respect to a waiver of the right to seek attorney fees is prospective because, regardless of the parties' circumstances at the time they executed a premarital agreement, those circumstances may later be affected disproportionately such that one party is unable to pursue or defend litigation that involves the best interest of a child.

[¶34] Furthermore, any reading of section 608 as providing the only circumstances in which a premarital agreement is unenforceable would directly conflict with section 604(8), which permits parties to contract to other matters in a premarital agreement only if those matters are not against public policy. *See* 19-A M.R.S. § 604(8); *see also Lehigh v. Pittston Co.*, 456 A.2d 355, 361 (Me. 1983) ("[C]ontracts against public policy . . . [are] void and unenforceable.").

[¶35] Accordingly, we conclude that a waiver in a premarital agreement of the right to seek attorney fees is valid under the UPAA's catch-all provision

---

938 A.2d 812. The parties in *Estate of Martin* did not dispute the premarital agreement on public policy grounds.

as "[a]ny other matter" only to the extent that its application does not violate public policy.[9]  *See* 19-A M.R.S. § 604(8).

### 3.    Public Policy

[¶36]  We do not enforce contracts, or their provisions, that contravene public policy.  *See, e.g.*, *Court v. Kiesman*, 2004 ME 72, ¶¶ 11, 14, 850 A.2d 330. "A contract is against public policy if it clearly appears to be in violation of some well established rule of law, or that its tendency will be harmful to the interests of society."  *Allstate Ins. Co. v. Elwell*, 513 A.2d 269, 272 (Me. 1986) (quotation marks omitted); *see also State Farm Mut. Auto. Ins. Co. v. Koshy*, 2010 ME 44, ¶ 42, 995 A.2d 651 (explaining that a contract is void as against public policy

---

[9]  Riemann argues that 19-A M.R.S. § 604 (2021) authorizes parties to waive the right to seek an award of attorney fees because such fees and the right to request them fall within two explicitly permitted subjects of a premarital agreement: "rights and obligations" in property and "spousal support."  *Id.* § 604(1), (4).  His arguments are unavailing.  The right to request attorney fees does not fit within the "rights and obligations of each of the parties in any of the property of either or both of them," described in subsection 1, because such an expansive interpretation would render other subsections mere surplusage, a result that we take care to avoid.  *See Thornton Acad. v. Reg'l Sch. Unit 21*, 2019 ME 115, ¶ 14, 212 A.3d 340.  Specifically, because the disposition of property and spousal support are listed separately, *see* 19-A M.R.S. § 604(3), (4), it would be illogical and inconsistent to interpret subsection 1 so broadly as to sweep in those rights or any other rights that can be established only through a divorce judgment, *see FPL Energy Me. Hydro LLC v. Dep't of Envt. Prot.*, 2007 ME 97, ¶ 12, 926 A.2d 1197 (explaining that we seek to avoid absurd, inconsistent, unreasonable, and illogical results when considering a statute's plain meaning).  And although attorney fees can be awarded "in the *nature* of support" in a divorce action, 19-A M.R.S. § 952(3) (2021) (emphasis added), attorney fees are not inherently spousal support and become a form of spousal support only if a court so specifies.  Finally, we interpret the meaning of these provisions in context and glean from the language of 19-A M.R.S. § 604(8) that by allowing parties to contract as to "[a]ny other matter . . . not in violation of public policy," the Legislature conveyed that "other matters," like the matters enumerated in subsections 1 through 7, are not authorized subjects of a premarital agreement if they violate public policy.

"only if it violates a well-defined and dominant policy that may be ascertained from the law and legal precedent"). In order to determine whether a contract violates public policy, "we balance the freedom of the parties to contract against the detriment to society that would result from [its] enforcement," *Koshy*, 2010 ME 44, ¶ 42, 995 A.2d 651, while also recognizing that contracts "are not to be lightly set aside," *Elwell*, 513 A.2d at 272 (quotation marks omitted).

[¶37] Although the enforceability of a provision in a premarital agreement waiving attorney fees is a matter of first impression in Maine, other jurisdictions that have considered such a waiver in the context of child-related matters have concluded that the waiver is unenforceable.[10] The common public policy concern underlying each of those decisions was an awareness that enforcement of a provision waiving attorney fees could stifle a court's ability to address issues affecting the best interest of the child. *See In re Marriage of Burke*, 980 P.2d 265, 268 (Wash. Ct. App. 1999) ("The state's interest in the

---

[10] *See In re Marriage of Burke*, 980 P.2d 265, 266-68 (Wash. Ct. App. 1999) (holding that an attorney fee waiver in a premarital agreement is unenforceable as applied to "parenting plan issues"); *Best*, 901 N.E.2d at 968-72 (holding the same as applied to "child-related issues"); *Erpelding*, 917 N.W.2d at 246-47 (holding the same as applied to both child support and child custody matters); *In re Marriage of Ikeler*, 161 P.3d 663, 670-71 (Colo. 2007) (holding that an attorney fee waiver in a premarital agreement is always reviewable for its unconscionability and that, as applied to parental responsibilities and child support, it will violate public policy when one party is financially disadvantaged); *see also In re Marriage of Joseph*, 266 Cal. Rptr. 548, 550-53 (Ct. App. 1990) (concluding that a provision in the parties' post-dissolution settlement agreement waiving attorney fees was unenforceable as applied to the parties' child custody dispute).

welfare of children requires that the court have the discretion to make an award of attorney fees and costs so that a parent is not deprived of his or her day in court. . . ."); *In re Marriage of Ikeler*, 161 P.3d 663, 670-71 (Colo. 2007) ("If one spouse is unable to hire an attorney, . . . the lesser-earning spouse's ability to effectively litigate the issues related to the children will be substantially impaired. This, in turn, may negatively impact the court's ability to assess the best interests of the children."); *In re Marriage of Best*, 901 N.E.2d 967, 970 (Ill. App. Ct. 2009) ("[T]he fee-shifting ban in the agreement . . . violates public policy by discouraging both parents from pursuing litigation in their child's best interests."); *see also In re Marriage of Joseph*, 266 Cal. Rptr. 548, 552 (Ct. App. 1990) ("[P]arties cannot by contract limit the court's power to resolve issues concerning children's welfare. . . .").

[¶38] Particularly persuasive is the reasoning of the Iowa Supreme Court, which determined that, because Iowa's legislature requires that custody issues be determined by a court's analysis of the child's best interest, "provisions in a premarital agreement that limit child custody rights are void as a matter of public policy."[11] *In re Marriage of Erpelding*, 917 N.W.2d 235, 246

---

[11] When determining that an attorney-fee-waiver provision in a premarital agreement was unenforceable, other jurisdictions similarly considered laws providing that a premarital agreement as to child custody is not binding on a court. *See Best*, 901 N.E.2d at 970 ("Illinois law per se rejects premarital agreements that impair child-support rights or specify custody."); *Burke*, 980 P.2d at

(Iowa 2018). It then concluded that, "[a]s a corollary, provisions in a premarital agreement that contain fee-shifting bars as to the litigation of child custody" must also be "void as a matter of public policy." *Id*. at 247. Such a conclusion was consistent with Iowa's UPAA, the court reasoned, because, like Maine's UPAA, Iowa's law provided that parties could contract only as to "other matter[s] . . . not in violation of public policy." *Id*. at 238, 247; *see* 19-A M.R.S. § 604(8).

[¶39] In light of the Maine Legislature's similar, well-defined policy that courts must discern the best interest of the child in matters involving parental rights and responsibilities, *see* 19-A M.R.S. §§ 1001, 1653(3) (2021), we agree that any provision in a premarital agreement that may hinder the court's ability to assess and address issues regarding the best interest of a child, including a provision that could negatively affect a party's right to litigate such issues, is void and unenforceable, *cf. Court*, 2004 ME 72, ¶¶ 2, 9, 12-13, 850 A.2d 330 (holding that a contract to sell a truck in exchange for the father's release of his child support obligation was void as against public policy when court-ordered

---

267-68 ("Washington [law] . . . generally prohibit[s] marital agreements that divest the court of its authority and discretion over issues affecting the rights and welfare of . . . children."); *see also Kessler v. Kessler*, 818 N.Y.S.2d 571, 575 (App. Div. 2006) ("[A] prenuptial agreement as to child custody is not binding on [a] court.").

22

child support is meant "to protect the best interests and welfare of the benefiting child").[12]

[¶40]  The effectiveness of the right to litigate issues related to a child's best interest may depend on a party's ability to fund that litigation, including the assistance of an attorney, and we share the concern expressed by other jurisdictions that a party's financial circumstances could affect a court's ability—and obligation—to discern the best interest of the party's child. Enforcement of a provision in a premarital agreement waiving attorney fees could expose the child and the parties to the risk that the terms of the agreement, rather than the court's understanding of the child's best interest,

---

[12]  The new Uniform Premarital and Marital Agreements Act (2012), which was proposed to supersede the Uniform Premarital Agreement Act (1983) but has not been enacted in Maine, makes clear that "[a] term in a premarital agreement or marital agreement which defines the rights or duties of the parties regarding custodial responsibility is not binding on the court." Unif. Premarital and Marital Agreements Act § 10(a), (c), 9C U.L.A. 28 (Supp. 2021) (defining "custodial responsibility" as "physical or legal custody, parenting time, access, visitation, or other custodial right or duty with respect to a child"). The rationale for this rule is the "long-standing consensus that premarital agreements may not bind a court on matters relating to children .... [P]arents and prospective parents do not have the power to waive the rights of third parties (their current or future children), and do not have the power to remove the jurisdiction or duty of the courts to protect the best interests of minor children." *Id.* § 10 cmt.; *see also* Restatement (Second) of Conts. § 191 (Am. L. Inst. 1981) ("A promise affecting the right of custody of a minor child is unenforceable on grounds of public policy unless the disposition as to custody is consistent with the best interest of the child.").

will determine the outcome of issues, such as custody, that require an analysis of the best interest of the child.[13]

[¶41]  Therefore, when the best interest of a child is at issue, the freedom to contract does not outweigh the detriment that could result from enforcement of a premarital agreement's provision waiving attorney fees.  Here, the parties' litigation of parental rights required a determination of the child's best interest, and we hold that, pursuant to 19-A M.R.S. § 604(8), the parties' waiver in their premarital agreement of the right to seek an award of attorney fees is unenforceable as against public policy.

### 4.    The Referee's Award of Attorney Fees

[¶42]  Riemann last argues that the referee should have been required to make specific findings as to Toland's inability to pay her own attorney fees. However, application of the holding we now announce is not dependent on a determination that one party is in fact financially disadvantaged.  Rather, an award of attorney fees pursuant to 19-A M.R.S. § 105 is committed to the fact finder's sound discretion and necessarily requires consideration of the parties'

---

[13] The potential effect of a provision in a premarital agreement waiving attorney fees on a party's ability to obtain child support also directly conflicts with the UPAA's direction in section 604 that "[t]he right of a child to receive support" not be "adversely affected by a premarital agreement," 19-A M.R.S. § 604; *see Erpelding*, 917 N.W.2d at 246, and frustrates a court's ability to protect the best interest of the child, *see Court v. Kiesman*, 2004 ME 72, ¶¶ 9, 12-13, 850 A.2d 330.

relative capacity to absorb the costs of litigation in addition to all other relevant factors that serve to create a fair and just award under the totality of the circumstances. *Pearson*, 2015 ME 136, ¶ 45, 125 A.3d 1149; *see Rosen v. Rosen*, 651 A.2d 335, 336-337 (Me. 1994) (explaining that the "parties' relative financial position . . . must be considered," but that the trial court also "has discretion to consider all factors that reasonably bear on the fairness and the justness of the award"); *see also Ackerman v. Yates*, 2004 ME 56, ¶ 19, 847 A.2d. 418 (clarifying that the fact finder can consider the parties' income and assets when assessing their relative financial positions).

[¶43] Here, after making findings and recommendations as to the issues pending before her, the referee acknowledged her obligation to consider the parties' capacity to absorb the cost of litigation, assessed the totality of the evidence, and concluded that Toland should be awarded $50,000 in attorney fees. The record includes the parties' financial statements and child support affidavits as well as the parties' tax returns and the premarital agreement. It also includes an attorney fee affidavit from Toland's attorney, referencing counsel's willingness to submit copies of billing statements for in camera review and providing counsel's hourly rate and experience in the practice of

law. *See Pearson*, 2015 ME 136, ¶ 47 & n.7, 125 A.3d 1149; *Miele v. Miele*, 2003 ME 113, ¶ 17, 832 A.2d 760.

[¶44]  Finally, neither party argues that the amount of attorney fees awarded was unreasonable, and the referee's findings as to the parties' income for the purpose of determining the "child-related issues," which were "many and complicated in this case," provide sufficient bases for the award of attorney fees.[14]  *See Pearson*, 2015 ME 136, ¶ 46, 125 A.3d 1149 (determining that findings presented in the context of other issues "were sufficient to apprise the parties of the reasons why the amount of attorney fees awarded . . . was reasonable under the circumstances" when those findings also extended to the issue of attorney fees).  Considering the disparity in the parties' income as found by the referee, the totality of the circumstances, and the supporting record evidence, we discern no abuse of discretion in the referee's award of attorney fees to be paid by Riemann.

The entry is:

Judgment affirmed.

---

[14]  Neither party argued to the referee, to the court, or to us that other issues beyond parental rights were litigated in this case, and the parties' premarital agreement was dispositive as to most, if not all, other issues.  Further, Toland's attorney represented to the referee, and to us at oral argument, that the entire amount of his fees billed in this case were for his services in connection with the contested custody issue.

26

Keith P. Richard, Esq. (orally), Libby O'Brien Kingsley & Champion, LLC, Kennebunk, for appellant Helge Riemann

Kenneth P. Altshuler, Esq. (orally), Childs Rundlett & Altshuler, Portland, for appellee Kristina A. Toland

West Bath District Court docket number FM-2018-324
For Clerk Reference Only